REBECCA WENDELN, APPELLEE, V.
THE BEATRICE MANOR, INC., APPELLANT.

712 N.W.2d 226

Filed April 7, 2006.   No. S-05-188.

Michaela Skogerboe and Brent M. Kuhn, of Harris Kuhn Law Firm, L.L.P., for appellant.

Carole McMahon-Boies for appellee.

HENDRY, C.J., CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.

McCORMACK, J.
## NATURE OF CASE
The primary issue presented in this appeal is whether we should recognize a public policy-based cause of action for retaliatory discharge when an employer discharges an employee for making a report to the Nebraska Department of Health and Human Services (DHHS) as mandated by the Adult Protective Services Act (APSA), Neb. Rev. Stat. §§ 28-348 to 28-387 (Reissue 1995 & Cum. Supp. 2004).

## FACTUAL BACKGROUND
Rebecca Wendeln, a certified nursing assistant, began working at The Beatrice Manor, Inc. (Beatrice Manor), in May 2000 as a staffing coordinator. A particular patient at Beatrice Manor was wheelchair-bound, and it was Wendeln's understanding that any time the patient was lifted or transferred, such transfer needed to be done by two persons and with a gait belt (an ambulatory aid used to transfer or mobilize patients). In December 2001, a "very upset" medical aide approached Wendeln, describing that

approximately 2 weeks prior, this patient had been improperly moved and had fallen and bruised herself. The aide reported that she had offered to assist another aide in the transfer of the patient, but that the other aide had refused to let her help. The next thing the aide observed was the patient on the floor with no gait belt in sight. The aide told Wendeln that she had informed the administrator and the acting director of nursing about the incident, but that the aide did not believe that it had been properly reported to DHHS or was otherwise being taken care of.

That same day, a licensed practical nurse at Beatrice Manor also approached Wendeln about the incident, expressing concern that nothing was being done about it. The nurse did not witness the incident, but was a relative of the patient. In response to these reports, Wendeln approached another aide who was working the day of the incident to confirm that it had actually occurred. That aide had been called to help the patient off of the floor and told Wendeln that pain medication had been given to the patient as a result of the fall.

Wendeln then called DHHS to make sure that it had been reported. When DHHS indicated that no incident had been reported, Wendeln made a report.

A few days after her report to DHHS, Wendeln was called into her supervisor's office. Wendeln said that her supervisor was very angry with her after having learned that Wendeln had made a report with DHHS without having first spoken to her. Wendeln testified that her supervisor was "very aggressive" and made her feel scared and intimidated. Wendeln, who was 21 years old at the time, asked for some time off work because she "didn't know how [she] was going to face [her supervisor] after the way she had aggressively approached [her]." Her supervisor granted her the time off. Wendeln testified that during this time, she felt very nervous and upset. She explained that she had never before been "attacked" in such a manner by either a peer or a supervisor.

Upon Wendeln's return to work on her next scheduled workday, Wendeln found that the locks to her office had been changed. Eventually, her supervisor appeared and told Wendeln to follow her to her office. There, Wendeln was asked to resign, and when she refused, she was told she was fired. Her official termination date was January 2, 2002.

Wendeln testified that after her discharge from employment, even though she had a close family friend as a patient at Beatrice Manor, she never felt comfortable enough to be able to return to visit. She explained that on the one occasion she had returned to the facility to pick up her W-2 form, her former supervisor had come out of the building and stood watching her park her car. Thereafter, the supervisor stood by the nurses' station as Wendeln picked up the W-2 form, making Wendeln feel uncomfortable.

After her discharge from employment at Beatrice Manor, Wendeln was unable to find other employment in Beatrice, where she lived near her mother. She eventually found work in Lincoln.

## PROCEDURAL HISTORY

On January 27, 2003, Wendeln filed this action against Beatrice Manor. Her original action sought declaratory, injunctive, and monetary relief under the whistleblower provisions of the Nebraska Fair Employment Practice Act (NFEPA), Neb. Rev. Stat. § 48-1101 et seq. (Reissue 1998), as actionable under Neb. Rev. Stat. § 20-148 (Reissue 1997). However, she was allowed to amend her complaint to add the allegation that she suffered from wrongful termination in contravention of the public policy of the State of Nebraska, as articulated in the APSA. On April 5, 2004, Beatrice Manor, pursuant to leave granted by the court, filed an amended answer alleging for the first time that Wendeln's claims were barred by the 300-day statute of limitations period set forth in § 48-1118(2).

The court granted a motion by Wendeln to dismiss her first cause of action which alleged relief under the NFEPA and § 20-148, reasoning that essentially the same cause of action was pending before the Nebraska Equal Opportunity Commission. The court overruled respective motions for summary judgment by Wendeln and Beatrice Manor, and the case went to trial before a jury on Wendeln's second cause of action alleging retaliatory discharge in contravention of the public policy mandate expressed by the reporting provisions of the APSA.

Prior to trial, the court overruled Beatrice Manor's motion in limine for an order precluding Wendeln from making any reference to damages in the form of pain and suffering, loss of enjoyment of life, or humiliation. Beatrice Manor's motion was

based on its argument that Wendeln's claim sounded in contract and that noneconomic damages were not recoverable as a matter of law. The jury was eventually instructed that it "must determine the amount of any *noneconomic damages* sustained by [Wendeln] such as mental suffering, emotional distress and humiliation." (Emphasis in original.) Beatrice Manor objected to the instruction on the ground that Wendeln's cause of action sounded in contract and on the alternative ground that "there has been no evidence that [Wendeln] did sustain the mental suffering, emotional distress and humiliation as a result of this incident, as required by law."

The court also refused Beatrice Manor's proposed jury instruction that Wendeln had the burden to prove that she "acted in good faith and upon reasonable cause in reporting the suspected abuse." Over Beatrice Manor's objection, the jury was instructed only that it must find that Wendeln "acted upon reasonable cause in reporting the suspected abuse."

The jury returned a verdict in favor of Wendeln, finding actual damages in the amount of $4,000 and noneconomic damages in the amount of $75,000, for a total of $79,000. Beatrice Manor moved for a new trial and remittitur, which alleged that the noneconomic damages granted Wendeln were clearly excessive and made under the influence of passion or prejudice.

## ASSIGNMENTS OF ERROR

Beatrice Manor argues, summarized and restated, that the trial court erred in (1) failing to find that the applicable statute of limitations was the 300-day period set forth in § 48-1118(2), rather than the general 4-year limitation period found in Neb. Rev. Stat. § 25-207 (Reissue 1995); (2) failing to find as a matter of law that Wendeln's public policy retaliatory discharge claim sounded in contract and, therefore, noneconomic damages were not recoverable; (3) instructing the jury that it was Wendeln's burden to prove that her report to DHHS was made upon reasonable cause, without also instructing the jury that she must prove the report was made in "good faith"; (4) instructing the jury on noneconomic damages when the evidence was insufficient to show that Wendeln suffered "severe" emotional distress as a result of her discharge; and (5) failing to set aside the jury's verdict of noneconomic damages as excessive.

Beatrice Manor also assigns as error the trial court's failure to grant Beatrice Manor summary judgment on the ground that no material issue of fact existed as to Wendeln's lack of good faith and reasonable cause in reporting the alleged abuse to DHHS. However, the issue of whether a denial of summary judgment should have been granted generally becomes moot after a full trial on the merits. *Moyer v. Nebraska City Airport Auth.*, 265 Neb. 201, 655 N.W.2d 855 (2003). Moreover, Beatrice Manor did not preserve any issue as to the sufficiency of the evidence regarding whether Wendeln acted upon reasonable cause because it failed to make a motion for directed verdict at the close of the evidence, or any other motion questioning the sufficiency of the evidence in that respect. We do not, therefore, consider this issue. As to good faith, we determine in this opinion that "good faith" is not a requirement in reporting under the APSA.

## STANDARD OF REVIEW

■ Which statute of limitations applies is a question of law that an appellate court must decide independently of the conclusion reached by the trial court. *Andres v. McNeil Co.*, 270 Neb. 733, 707 N.W.2d 777 (2005).

■ A jury verdict will not be disturbed on appeal as excessive unless it is so clearly against the weight and reasonableness of the evidence and so disproportionate as to indicate that it was the result of passion, prejudice, mistake, or some means not apparent in the record, or that the jury disregarded the evidence or rules of law. *Barks v. Cosgriff Co.*, 247 Neb. 660, 529 N.W.2d 749 (1995).

A motion for new trial is to be granted only when error prejudicial to the rights of the unsuccessful party has occurred. *Id.*

Whether the jury instructions given by a trial court are correct is a question of law. *Malone v. American Bus. Info.*, 264 Neb. 127, 647 N.W.2d 569 (2002).

## ANALYSIS

### STATUTE OF LIMITATIONS

We first address Beatrice Manor's assertion that Wendeln's claim is barred by the applicable statute of limitations, which it asserts is the 300-day period stated in the NFEPA. The trial court

determined that Wendeln's action was governed by the general 4-year statute of limitations set forth by § 25-207.

In determining which statute of limitations applies to any given cause of action, we bear in mind that a special statute of limitations controls and takes precedence over a general statute of limitations because the special statute is a specific expression of legislative will concerning a particular subject. *Andres v. McNeil Co., supra.* Moreover, the essential nature of a proceeding may not be changed, thereby lengthening the statute of limitations, merely by denominating it as something other than what it actually is. *ABC Radio Network v. State of N.Y. Dept.*, 294 A.D.2d 213, 742 N.Y.S.2d 261 (2002). To determine the nature of an action, a court must examine and construe a complaint's essential and factual allegations by which the plaintiff requests relief, rather than the legal terminology utilized in the complaint or the form of a pleading. See *Henriksen v. Gleason*, 263 Neb. 840, 643 N.W.2d 652 (2002). However, just because there may be some overlap between relevant facts, it does not change the conclusion that various causes of action are stated based on separate and distinct factual occurrences. See *Larson v. Demuth*, 252 Neb. 668, 564 N.W.2d 606 (1997).

Beatrice Manor asserts that although Wendeln denominates her cause of action as a retaliatory discharge action in contravention of public policy, it remains in essence an employment discrimination case under the NFEPA brought directly for judicial relief against the former employer pursuant to § 20-148. In *Adkins v. Burlington Northern Santa Fe RR. Co.*, 260 Neb. 156, 615 N.W.2d 469 (2000), we stated that NFEPA actions brought pursuant to § 20-148 were governed by the 300-day statute of limitations period found in § 48-1118(2) of the NFEPA.

Wendeln asserts that her amended complaint states only a cause of action for retaliatory discharge in violation of public policy, which constitutes a cause of action separate and distinct from a claim based on the NFEPA. Indeed, Wendeln argues that in her case, a careful examination of the essential allegations of her complaint would reveal that she does not state a cause of action under the NFEPA at all.

In *Adkins*, the plaintiff alleged that the decision of his employer not to hire him for a specific position was substantially

motivated by racial or retaliatory animus and that these actions constituted illegal discrimination in violation of the NFEPA. His claims under the NFEPA, however, were not brought pursuant to the NFEPA, which provides administrative relief from employment discrimination. Rather, they were brought pursuant to § 20-148, which authorizes judicial relief for a deprivation of rights, privileges, or immunities secured by the U.S. Constitution or the Constitution and laws of the State of Nebraska.

We ultimately rejected the plaintiff's argument that since § 20-148 contained no statute of limitations, his claim was governed by the 4-year catchall limitations period set forth in Neb. Rev. Stat. § 25-212 (Reissue 1995). Instead, we held that "§ 48-1118(2) provides the applicable statute of limitations (i.e., within 300 days after the occurrence of the alleged unlawful employment practice) for [N]FEPA claims brought pursuant to § 20-148." *Adkins v. Burlington Northern Santa Fe RR. Co.*, 260 Neb. at 163, 615 N.W.2d at 473.

We noted that by determining the 300-day statute of limitations under § 48-1118(2) to be controlling, we avoided "using § 20-148 to inadvertently create expanded rights (other than an alternative civil avenue of recovery) not present in an administrative [N]FEPA claim." 260 Neb. at 163, 615 N.W.2d at 474. This was important because we had previously held that § 20-148 was "'a procedural statute which does not create any new substantive rights.'" 260 Neb. at 163, 615 N.W.2d at 474 (quoting *Goolsby v. Anderson*, 250 Neb. 306, 549 N.W.2d 153 (1996)).

Under the NFEPA, § 48-1114 states:

It shall be an unlawful employment practice for an employer to discriminate against any of his or her employees or applicants for employment, for an employment agency to discriminate against any individual, or for a labor organization to discriminate against any member thereof or applicant for membership, because he or she (1) has opposed any practice made an unlawful employment practice by the Nebraska Fair Employment Practice Act, (2) has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under the act, or (3) has opposed any practice or refused to carry out any action unlawful under federal law or the laws of this state.

Section 48-1102(15) defines "[u]nlawful under federal law or the laws of this state shall mean acting contrary to or in defiance of the law or disobeying or disregarding the law." Wendeln explains that she does not state a claim under the NFEPA insofar as she fails to allege that her discharge from employment was related either to (1) her opposition to any practice made unlawful by the NFEPA; (2) making a charge, testifying, assisting, or participating in any charge, investigation, proceeding, or hearing under the NFEPA; or (3) opposing any practice or refusing to carry out any unlawful action.

Instead, Wendeln asserts that she was discharged in retaliation for reporting a negligent act which was not unlawful. Specifically, she asserts that she was discharged in retaliation for filing a complaint as required by the APSA. Section 28-384 makes it a Class III misdemeanor for any person to willfully fail to make any report required by the APSA. Section 28-372(1) provides in part:

> When any physician, psychologist, physician assistant, nurse, nursing assistant, other medical, developmental disability, or mental health professional, law enforcement personnel, caregiver or employee of a caregiver, operator or employee of a sheltered workshop, owner, operator, or employee of any facility licensed by the Department of Health and Human Services Regulation and Licensure, or human services professional or paraprofessional not including a member of the clergy has reasonable cause to believe that a vulnerable adult has been subjected to abuse or observes such adult being subjected to conditions or circumstances which reasonably would result in abuse, he or she shall report the incident or cause a report to be made to the appropriate law enforcement agency or to the department.

"Abuse" is defined in § 28-351 as "any knowing, intentional, or negligent act or omission on the part of a caregiver, a vulnerable adult, or any other person which results in physical injury, unreasonable confinement, cruel punishment, sexual abuse, exploitation, or denial of essential services to a vulnerable adult." "Physical injury" is defined in § 28-363 as "damage to bodily tissue caused by nontherapeutic conduct, including, but not limited to, fractures, bruises, lacerations, internal injuries, or

dislocations, and shall include, but not be limited to, physical pain, illness, or impairment of physical function."

We agree with the trial court's determination that the essential nature of Wendeln's stated cause of action does not lie in the NFEPA, but, rather, lies in the public policy mandate that she alleges is expressed by the APSA. Without making any determination as to the hypothetical complaint which simultaneously states a cause of action under both the civil rights provisions of the NFEPA and under a public policy exception allowing a retaliatory discharge action for an at-will employee, it is clear in this case that not only does the denomination of Wendeln's cause of action accurately reflect its true nature, but that the facts alleged simply do not state a cause of action for a claim under the NFEPA. Wendeln did not allege that she was discharged for opposing any unlawful employment practice, participating in a proceeding under the NFEPA, or opposing or refusing to carry out an unlawful act. Rather, she claimed that her employment was terminated because she did what the law affirmatively required her to do.

As such, *Adkins v. Burlington Northern Santa Fe RR. Co.*, 260 Neb. 156, 615 N.W.2d 469 (2000), has no bearing to the case at bar. In *Adkins*, there was no dispute that the employer's conduct violated the NFEPA. The employee in *Adkins* merely elected the alternative judicial remedy for that conduct claimed to be found in § 20-148, rather than the administrative remedy found in the NFEPA. Our holding in *Adkins* narrowly focused on the applicability of the 300-day limitations period *to claims under the NFEPA*, and nowhere stated that the 300-day limitations period should apply to any wrongful discharge claim or to any claim cognizable under § 20-148. *Adkins v. Burlington Northern Santa Fe RR. Co., supra*. See, also, *Hassler v. Alegent Health*, 198 F. Supp. 2d 1108 (D. Neb. 2002) (statute of limitations *for NFEPA claims* brought pursuant to § 20-148 is 300 days). Thus, while it may be argued that Wendeln's claim falls under the broad language of § 20-148, given the strictly procedural nature of the statute, such fact alone is of little significance. We conclude that the 300-day NFEPA statute of limitations is inapplicable to Wendeln's public policy retaliatory discharge claim currently before us.

Yet despite a line of cases allowing limited retaliatory discharge claims for discharge in contravention of a clear mandate of public policy, this court has never clearly expressed exactly what statute of limitations period is applicable to these claims. In *Poppert v. Brotherhood of R. R. Trainmen*, 187 Neb. 297, 189 N.W.2d 469 (1971), we held that an employee's wrongful discharge claim was governed by the statute of limitations on written contracts. However, the plaintiff's retaliatory discharge action in *Poppert* was based upon a collective bargaining agreement. An examination of authority from other jurisdictions reveals that generally, when a wrongful discharge claim is based on public policy, and not on an implied or actual employment contract, such claim sounds in tort.

Thus, for example, in *Murphy v. City of Topeka*, 6 Kan. App. 2d 488, 630 P.2d 186 (1981), the court found that a public policy retaliatory discharge claim arising out of the employee's filing for workers' compensation benefits sounded in tort and not in contract. The court noted that generally, a breach of contract may be said to be a material failure of performance of a duty arising under or imposed by agreement. A tort, on the other hand, is a violation of a duty imposed by law, a wrong independent of contract. This is not to say, the court further explained, that a tort cannot be committed by parties to a contract. " 'The question to be determined . . . is whether the actions or omissions complained of constitute a violation of duties imposed by law, or of duties arising by virtue of the alleged expressed agreement between the parties.' " *Id.* at 492, 630 P.2d at 190.

The court in *Murphy* thus focused on the fact that the employee's retaliation claim was based upon the public policy implicit in the workers' compensation statute, and the employee did not claim the existence of a contract of employment. His termination of employment did not breach any express or implied contractual obligations, but, rather, it was recognized that he was an employee at will who could be terminated at any time with or without cause. Therefore, the court concluded that the employee's cause of action arose only from a violation of a duty imposed by law, that duty imposed by the public policy of the workers' compensation statute. Accordingly, such action clearly sounded in tort. *Id.* See, also, e.g., *Tameny v. Atlantic Richfield*

*Co.*, 27 Cal. 3d 167, 164 Cal. Rptr. 839, 610 P.2d 1330 (1980); *Mackie v. Vaughan Chapter-Paralyzed Vets.*, 354 Ill. App. 3d 731, 820 N.E.2d 1042, 289 Ill. Dec. 967 (2004); *Frampton v. Central Ind. Gas Co.*, 260 Ind. 249, 297 N.E.2d 425 (1973); *Nelson v. Productive Alternatives, Inc.*, 696 N.W.2d 841 (Minn. App. 2005); *Hansen v. Harrah's*, 100 Nev. 60, 675 P.2d 394 (1984); *Porter v. City of Manchester*, 151 N.H. 30, 849 A.2d 103 (2004); *Potts v. Catholic Diocese of Youngstown*, 159 Ohio App. 3d 315, 823 N.E.2d 917 (2004); *Nees v. Hocks*, 272 Or. 210, 536 P.2d 512 (1975); *Korslund v. Dyncorp Tri-Cities Services*, 156 Wash. 2d 168, 125 P.3d 119 (2005); *Harless v. First National Bank*, 162 W. Va. 116, 246 S.E.2d 270 (1978). But see, e.g., *Brockmeyer v. Dun & Bradstreet*, 113 Wis. 2d 561, 335 N.W.2d 834 (1983).

■ We agree that a public policy-based retaliatory discharge claim is based in tort. Accordingly, such a claim is governed by the general 4-year statute of limitations period found in § 25-207. Wendeln's claim is not barred by the applicable statute of limitations.

## Public Policy Exception

The public policy upon which Wendeln relies for her retaliatory discharge claim has not yet been recognized by this court. Beatrice Manor asserts that unlike other retaliatory discharge cases decided by this court, "[t]here is no clear legislative enactment declaring an important public policy with such clarity as to provide a basis for [Wendeln's] civil action for wrongful discharge." Brief for appellant at 27-28.

■ The clear rule in Nebraska is that unless constitutionally, statutorily, or contractually prohibited, an employer, without incurring liability, may terminate an at-will employee at any time with or without reason. *Jackson v. Morris Communications Corp.*, 265 Neb. 423, 657 N.W.2d 634 (2003). We recognize, however, a public policy exception to the at-will employment doctrine. *Id.* Under the public policy exception, we will allow an employee to claim damages for wrongful discharge when the motivation for the firing contravenes public policy. *Id.* In *Ambroz v. Cornhusker Square Ltd.*, 226 Neb. 899, 905, 416 N.W.2d 510, 515 (1987), we explained, however, that it was

important that abusive discharge claims of employees at will be limited to "manageable and clear standards." Thus, "[t]he right of an employer to terminate employees at will should be restricted only by exceptions created by statute or to those instances where a very clear mandate of public policy has been violated." *Id.*

In *Jackson v. Morris Communications Corp., supra,* we held that an employee could state a cause of action for retaliatory discharge based upon the allegation that the employee was terminated from her employment because she filed a workers' compensation claim. In so doing, we recognized that Nebraska law neither specifically prohibited an employer from discharging an employee for filing a workers' compensation claim, nor specifically made it a crime for an employer to do so. Nevertheless, we concluded that "the general purpose and unique nature of the Nebraska Workers' Compensation Act itself provides a mandate for public policy." *Jackson v. Morris Communications Corp.,* 265 Neb. at 431, 657 N.W.2d at 640. We explained that the Nebraska Workers' Compensation Act was meant to create substantive rights for employees and that such beneficent purpose would be undermined by failing to adopt a rule which allows a retaliatory discharge claim for employees discharged for filing a workers' compensation claim. This is because were we not to recognize such a public policy exception to the employment-at-will doctrine, the substantive rights granted by the Nebraska Workers' Compensation Act could simply be circumvented by the employer's threatening to discharge the employee if he or she exercised those rights.

In *Hausman v. St. Croix Care Center,* 214 Wis. 2d 655, 571 N.W.2d 393 (1997), the Wisconsin Supreme Court applied similar principles in determining whether nursing home employees could state a claim of retaliatory discharge for reporting the alleged inappropriate care of patients. The bureau in charge of investigating reports of abuse and neglect in nursing home care ultimately concluded the investigation without issuing any citations. The law provided that any person who failed to act through reporting or taking some other form of action with regard to abuse or neglect of a nursing home patient was subject to a punishment ranging from a Class B misdemeanor to a Class D

felony, but did not specifically provide for a right of action for discharge in retaliation for such reporting.

The court in *Hausman* concluded that where the law imposes an affirmative obligation upon an employee to prevent abuse or neglect of nursing home residents, and the employee fulfills that obligation by reporting the abuse, an employer's termination of employment for fulfillment of the legal obligation exposes the employer to a wrongful termination action under the "fundamental and well-defined public policy of protecting nursing home residents from abuse and neglect." 214 Wis. 2d at 665, 571 N.W.2d at 397. The court generally abided by the principle that it would not protect an employee from discharge for "merely engaging in praiseworthy conduct consistent with public policy." *Id.* at 666, 571 N.W.2d at 397. However, it concluded that the mandatory reporting in issue went well beyond " 'merely praiseworthy conduct.' " *Id.* at 669, 571 N.W.2d at 398. The court explained that "[b]y applying the public policy exception to the situation presented here, employees would be relieved of the onerous burden of choosing between equally destructive alternatives: report and be terminated, or fail to report and be prosecuted." *Id.* at 668-69, 571 N.W.2d at 398. See, also, *Bachtel v. Miller County Nursing Home Dist.*, 110 S.W.3d 799 (Mo. 2003); *McQuary v. Bel Air Convalescent Home, Inc.*, 69 Or. App. 107, 684 P.2d 21 (1984).

We agree with the reasoning expressed above and find that the purpose of the APSA would be circumvented if employees mandated by the APSA to report suspected patient abuse could be threatened with discharge for making such a report. The Legislature articulates public policy when it declares certain conduct to be in violation of the criminal law. See, *Schriner v. Meginnis Ford Co.*, 228 Neb. 85, 421 N.W.2d 755 (1988); *Ambroz v. Cornhusker Square Ltd.*, 226 Neb. 899, 416 N.W.2d 510 (1987); *Simonsen v. Hendricks Sodding & Landscaping*, 5 Neb. App. 263, 558 N.W.2d 825 (1997). The APSA makes a clear public policy statement by utilizing the threat of criminal sanction to ensure the implementation of the reporting provisions set forth to protect the vulnerable adults with which the APSA is concerned. Thus, we determine that a public policy exception to the employment-at-will doctrine applies to allow a

cause of action for retaliatory discharge when an employee is fired for making a report of abuse as mandated by the APSA. Having made such a determination, we examine Beatrice Manor's remaining assignments of error regarding "good faith" and noneconomic damages.

## GOOD FAITH

Beatrice Manor asserts that pursuant to *Schriner v. Meginnis Ford Co., supra,* if we recognize a retaliatory discharge claim for reporting abuse under the APSA, then such reporting must be made in "good faith" in order to state a cause of action. In *Schriner,* we stated that an action for wrongful discharge for reporting an employer's suspected criminal activities will lie only when the employee acts in good faith and upon reasonable cause in reporting his employer's suspected violation of the criminal code. Beatrice Manor asserts that the trial court erred in failing to recognize the good faith requirement when it refused to give the jury Beatrice Manor's proferred instruction that Wendeln had the burden to prove, by the greater weight of the evidence, that she "acted in good faith and upon reasonable cause in reporting the suspected abuse." The jury was ultimately only charged that it must find that Wendeln "had reasonable cause to believe that a vulnerable adult had been subjected to abuse."

Whether the jury instructions given by a trial court are correct is a question of law. *Malone v. American Bus. Info.*, 264 Neb. 127, 647 N.W.2d 569 (2002). To establish reversible error from a court's failure to give a requested jury instruction, an appellant has the burden of showing that (1) the tendered instruction is a correct statement of the law, (2) the tendered instruction was warranted by the evidence, and (3) the appellant was prejudiced by the court's failure to give the requested instruction. *Farmers Mut. Ins. Co. v. Kment,* 265 Neb. 655, 658 N.W.2d 662 (2003).

We agree with the trial court that in order for a retaliatory discharge action to lie against an employer for discharging an employee in retaliation for the mandatory filing of a report of patient abuse pursuant to § 28-372, such report must be based upon reasonable cause. Section 28-372 explicitly conditions its mandate to report upon the employee's having "*reasonable cause*

to believe that a vulnerable adult has been subjected to abuse or observes such adult being subjected to conditions or circumstances which reasonably would result in abuse." (Emphasis supplied.) It would follow that a discharge cannot be in violation of the public policy underlying the mandatory reporting of the APSA unless the APSA requires the reporting in question.

However, in specifying the standard which the employee must meet in order for an employee to fall under the mandatory reporting provisions, the APSA makes no mention of "good faith." We find no reason to write such an additional requirement into the public policy expressed by the APSA. Rather, under the language of the APSA, the reporting itself is broadly encouraged with the only caveat being that it be based upon a reasonable cause to believe that a vulnerable adult has been subjected to abuse or subjected to conditions or circumstances which reasonably would result in abuse. Such broadly encouraged reporting simply begins a further investigatory process which may or may not ultimately result in a conclusion that the abuse actually occurred. We find that Beatrice Manor's assignment of error as to the failure to instruct the jury as to "good faith" is without merit.

## NONECONOMIC DAMAGES

Finally, Beatrice Manor makes several assignments of error based upon its assertion that noneconomic damages are not recoverable as a matter of law in the type of retaliatory discharge action here presented or, alternatively, that there was insufficient evidence to support any finding of such damages. We first address whether, as a matter of law, noneconomic damages are recoverable in a public policy-based retaliatory discharge claim.

The issue of whether noneconomic damages are recoverable in a public policy-based retaliatory discharge claim presents a question of law, which an appellate court is obligated to reach a conclusion independent of the determination reached by the trial court. See *Semler v. Sears, Roebuck & Co.*, 268 Neb. 857, 689 N.W.2d 327 (2004). Beatrice Manor's argument that as a matter of law, noneconomic damages are not recoverable in Wendeln's retaliatory discharge action is predicated on its assertion that "[a]n action for wrongful discharge is in reality an action for

breach of contract." Brief for appellant at 33. Having already resolved this issue to the contrary conclusion that this action is an action in tort, we find Beatrice Manor's argument to be without merit.

In Nebraska, we have allowed plaintiffs in other types of tort actions to attempt to recover damages for mental suffering. See, e.g., *Duncza v. Gottschalk*, 218 Neb. 879, 359 N.W.2d 813 (1984); *Bishop v. Bockoven, Inc.*, 199 Neb. 613, 260 N.W.2d 488 (1977); *Crouter v. Rogers*, 193 Neb. 497, 227 N.W.2d 845 (1975); *Sabrina W. v. Willman*, 4 Neb. App. 149, 540 N.W.2d 364 (1995). We have not specifically addressed whether such damages are recoverable in actions claiming the tort of retaliatory discharge in contravention of public policy. However, it appears that the majority of other jurisdictions addressing this issue have explicitly recognized that an employee may recover damages for mental suffering in a wrongful discharge case, so long as the action lies in a public policy tort action, and not upon a contract of employment. See, *Travis v. Gary Community Mental Health Center*, 921 F.2d 108 (7th Cir. 1990); *Wiskotoni v. Michigan Nat. Bank-West*, 716 F.2d 378 (6th Cir. 1983); *Smith v. Atlas Off-Shore Boat Service, Inc.*, 653 F.2d 1057 (5th Cir. 1981); *Perry v. Hartz Mountain Corp.*, 537 F. Supp. 1387 (S.D. Ind. 1982); *Halbasch v. Med-Data, Inc.*, 192 F.R.D. 641 (D. Or. 2000); *Montgomery Coca-Cola Bottling v. Golson*, 725 So. 2d 996 (Ala. Civ. App. 1998); *Stivers v. Stevens*, 581 N.E.2d 1253 (Ind. App. 1991); *Hamer v. Iowa Civil Rights Com'n*, 472 N.W.2d 259 (Iowa 1991); *Harless v. First Nat'l Bank*, 169 W. Va. 673, 289 S.E.2d 692 (1982). Compare, e.g., *Brewster v Martin Marietta*, 145 Mich. App. 641, 378 N.W.2d 558 (1985); *Monge v. Beebe Rubber Co.*, 114 N.H. 130, 316 A.2d 549 (1974); *Chavez v. Manville Products Corp.*, 108 N.M. 643, 777 P.2d 371 (1989); *Cagle v. Burns and Roe*, 106 Wash. 2d 911, 726 P.2d 434 (1986); *Rodriguez v. Consolidation Coal Co.*, 206 W. Va. 317, 524 S.E.2d 672 (1999).

The court in *Niblo v. Parr Mfg., Inc.*, 445 N.W.2d 351, 355 (Iowa 1989), explained that it could think of "no logical reason why a wrongfully discharged employee's damages should be limited to out-of-pocket loss of income, when the employee also suffers causally connected emotional harm." The court noted

that it would not be unusual for a wrongful discharge to not only cause monetary loss, but also mental suffering, elaborating that " '[h]umiliation, wounded pride, and the like may cause very acute mental anguish.' " *Id.* The court thus concluded that the same public policy that justified the underlying retaliatory discharge claim also justified a recovery for the employee's complete injury and that "fairness alone justifies the allowance of a full recovery in this type of a tort." *Id.*

We hold that, as a matter of law, damages for mental suffering are recoverable in a retaliatory discharge action brought by a former at-will employee alleging that the discharge violated a clear mandate of public policy. We next consider whether the evidence was sufficient to support the jury's apportionment of such damages in this case.

Beatrice Manor argues that Wendeln failed to sustain her burden of proof of any such damages. Therefore, the trial court erred in submitting the issue of noneconomic damages to the jury and in failing to set aside the jury's verdict either by remittitur or by granting Beatrice Manor's motion for new trial. The amount of damages to be awarded is a determination solely for the fact finder, and its action in this respect will not be disturbed on appeal if it is supported by evidence and bears a reasonable relationship to the elements of the damages proved. *Genthon v. Kratville*, 270 Neb. 74, 701 N.W.2d 334 (2005).

The crux of Beatrice Manor's argument that there was insufficient evidence of noneconomic damages lies in its legal assumption that in order to be recoverable, Wendeln's mental distress must be " 'so severe that no reasonable person could have been expected to endure it' " and that " 'the emotional anguish or mental harm must be medically diagnosable and must be of sufficient severity that it is medically diagnosable.' " Brief for appellant at 38 (quoting *Hamilton v. Nestor*, 265 Neb. 757, 659 N.W.2d 321 (2003)). Beatrice Manor thus emphasizes that Wendeln failed to present evidence of "severe emotional distress," stating as follows:

> For example, she offered no evidence of a change in personality as a result of her termination, erosion of her relationship with her parents or friends, inability to work, inability to obtain employment, inability to participate in activities

she previously enjoyed, difficulty sleeping or eating, continuous crying, nightmare, nausea, medical attention or psychological counseling as the result of her alleged mental suffering or emotional distress, etc.

Brief for appellant at 39.

The cases upon which Beatrice Manor relies for its assertion that Wendeln was required to show that her mental suffering was medically diagnosable and severe are inapposite to the case at bar because they involve actions for intentional or negligent infliction of emotional distress. Wendeln's action is for retaliatory discharge, and while she claims emotional distress as an element of her damages, she does not attempt to set forth a separate cause of action for negligent or intentional infliction of emotional distress.

In *Kant v. Altayar*, 270 Neb. 501, 506, 704 N.W.2d 537, 541 (2005), we recently explained that there is a distinction between proof requirements in an action for negligent or intentional infliction of emotional distress and damages for mental suffering sought " 'where other interests have been invaded, and tort liability has arisen apart from the emotional distress.' " (Quoting Restatement (Second) of Torts § 46, comment *b*. (1965).) We thus held that a person suing on a theory of battery need not prove severe emotional distress in order to recover compensatory damages for such an injury, reasoning that " 'severe emotional distress' is not an element of the tort of battery." 270 Neb. at 507, 704 N.W.2d at 541. Instead, we concluded that the evidence was sufficient to submit damages for mental suffering to the jury where the plaintiff testified that she was ill for 2 days, continued to suffer emotionally, and had a lingering fear resulting from the battery, despite the fact that she had never sought medical treatment or counseling. See, also, *Perry v. Hartz Mountain Corp.*, 537 F. Supp. 1387 (S.D. Ind. 1982); *Niblo v. Parr Mfg., Inc.*, 445 N.W.2d 351 (Iowa 1989).

As in the tort of battery considered in *Kant v. Altayar, supra*, and unlike the torts of negligent or intentional emotional distress, severe emotional distress is not an element of the tort of retaliatory discharge in contravention of public policy. Accordingly, there is no threshold limitation based upon the degree of severity of the mental suffering, nor is it necessary to

show that the plaintiff sought medical treatment or counseling for the mental suffering in order for it to be recoverable as past and present damages. We find that mental suffering is simply an aspect of providing full recovery for the wrong, where present, and there is no rational reason to confine such full recovery to those former employees whose mental suffering has been severe.

That having been determined, we consider whether the evidence was sufficient to support the damages for mental suffering granted to Wendeln by the jury. In awarding damages for mental suffering, the fact finder must rely upon the totality of the circumstances surrounding the incident; the credibility of the evidence and the witnesses and the weight to be given all of these factors rest in the discretion of the fact finder. See *Woitalewicz v. Wyatt*, 229 Neb. 626, 428 N.W.2d 216 (1988). Accordingly, an appellate court is reluctant to interfere with the judgment of the fact finder in awarding damages for mental anguish, where the law provides no precise measurement. *Brandon v. County of Richardson*, 264 Neb. 1020, 653 N.W.2d 829 (2002).

In considering whether the trial court erred in failing to grant Beatrice Manor's motions for remittitur and for new trial, we first note that Beatrice Manor asks us to consider the fact that Wendeln's closing argument asked the jury to assess an amount of damages that "sends a message" to Beatrice Manor. Specifically, Wendeln's attorney argued that the jury "must assess the amount of damages that makes [Wendeln] whole, that makes up for the humiliation, the mental suffering, loss of enjoyment of life, the things that went along with this horrible experience." Counsel then proceeded to state:

> I encourage you to pick a figure that sends a message to Beatrice Manor that if you do this, we'll make sure [Wendeln] gets made whole. And that figure's up to you. This is a — Beatrice Manor is a corporation, and to make a corporation know that you have to pay what's right and what makes somebody whole, it's a little bit different. Pick a range, and it's your range, but I'd suggest a range some-where between $25,000 and $125,000. Pick a figure that you think lets this corporation know that this was not right and it cannot be done.

Beatrice Manor acknowledges that it made no objection to these statements, but asks this court to consider them simply as "further evidence that the jury relied on passion and prejudice in support of its verdict." Brief for appellant at 43.

In order to preserve, as a ground of appeal, an opponent's misconduct during closing argument, the aggrieved party must have objected to the improper remarks no later than at the conclusion of the argument. *Steele v. Sedlacek*, 267 Neb. 1, 673 N.W.2d 1 (2003); *Wolfe v. Abraham*, 244 Neb. 337, 506 N.W.2d 692 (1993). One may not waive an error, gamble on a favorable verdict, and, upon obtaining an unfavorable result, assert the previously waived error. *Wolfe v. Abraham, supra.* Beatrice Manor, although attempting to innocently frame this claim into its argument that the jury's verdict was excessive, is still attempting to press consideration of the alleged impropriety and prejudicial nature of statements made during closing argument. Since such statements were not properly objected to, we do not consider them in this review.

In arguing that the jury's verdict was excessive, Beatrice Manor also relies on this court's opinion in *Holmes v. Crossroads Joint Venture*, 262 Neb. 98, 629 N.W.2d 511 (2001), wherein we affirmed the trial court's grant of a new trial on the basis that the damages awarded were so excessive as to indicate that they were the result of passion or prejudice. The underlying claims were for assault and battery and for false imprisonment. The plaintiff was awarded $250,000 and $50,000, respectively, for the two causes of action, despite the fact that there was no evidence of medical bills or evidence of permanent injury or inability to work, and little evidence of emotional distress.

Beatrice Manor specifically focuses on our statement in *Holmes* as to the false imprisonment action that "[t]he record reflects that [the plaintiff] experienced a demeaning, humiliating, and anxiety-inducing incident and aftermath. However, there was no medical testimony by a physician or any other health professional regarding [the plaintiff's] asserted mental distress." 262 Neb. at 115, 629 N.W.2d at 525. *Holmes*, however, is clearly inapplicable to the case at bar. Most importantly, *Holmes* involved the review of a trial court's granting of a new trial, which, as we took pains to point out, involves a different

analytical framework than that for the review of a jury verdict where no new trial was granted. Here, we give deference to the fact finder in its assessment of these inherently imprecise damages. See, *Genthon v. Kratville*, 270 Neb. 74, 701 N.W.2d 334 (2005); *Brandon v. County of Richardson*, 264 Neb. 1020, 653 N.W.2d 829 (2002).

Wendeln presented evidence of the manner in which she was reprimanded and later fired and how she felt extremely upset, scared, and intimidated as a result. She reported that these feelings lasted not only through her time off before her official discharge, but for a long period of time thereafter. In light of all the evidence presented, we cannot say that the jury's findings were unsupported or bore no reasonable relationship to the evidence. See, e.g., *Rodriguez v. Consolidation Coal Co.*, 206 W. Va. 317, 524 S.E.2d 672 (1999) (award of $75,000 in noneconomic damages to former employee, in action for retaliatory discharge, was supported by evidence that employee suffered from embarrassment, depression, and periods of marital discord over financial pressures due to his unemployment). We thus find this assignment of error to likewise be without merit.

## CONCLUSION
For the reasons set forth above, we affirm the judgment of the trial court.

AFFIRMED.

WRIGHT, J., not participating.