Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
05/09/2025 09:09 AM CDT

Terri Dibbern, appellee, v. York Surgical
Associates, P.C., appellant.
___ N.W.3d ___

Filed May 9, 2025.    No. S-24-035.

1. **Judgments: Verdicts: Appeal and Error.** Review of a ruling on a motion for judgment notwithstanding the verdict is de novo on the record.
2. **Pleadings: Appeal and Error.** The content of the motion rather than its caption controls an appellate court's review.
3. **Termination of Employment.** Unless constitutionally, statutorily, or contractually prohibited, an employer, without incurring liability, may terminate an at-will employee at any time with or without reason.
4. **Termination of Employment: Public Policy: Damages.** Under the public policy exception to the at-will employment doctrine, an employee may claim damages for wrongful discharge when the motivation for the firing contravenes public policy.
5. **Termination of Employment: Public Policy: Legislature: Statutes.** When the Legislature includes a right to civil enforcement in the very statute that contains the public policy a common-law claim would protect, the common-law claim for wrongful discharge in violation of public policy becomes unnecessary.
6. **Federal Acts: Employer and Employee.** A remedy is provided under 31 U.S.C. § 3730(h) (2018) to employees who are harmed by their employer in retaliation for actions taken in furtherance of the False Claims Act.

Appeal from the District Court for York County: James C. Stecker, Judge. Reversed and remanded with direction.

Patrick M. Flood, of Pansing, Hogan, Ernst & Buser, L.L.P., for appellant.

James C. Zalewski, of Olson, Zalewski & Wynner, L.L.P., for appellee.

Funke, C.J., Miller-Lerman, Cassel, Stacy, Papik, and Freudenberg, JJ.

Per Curiam.

## NATURE OF CASE

Following a jury trial in the district court for York County, employee Terri Dibbern, appellee, was awarded a monetary judgment against her employer, York Surgical Associates, P.C. (YSA), appellant. YSA appeals the award and amount of damages. By the time of trial, only an alleged cause of action for termination of employment in violation of public policy remained and was submitted to the jury. As explained below, we conclude on the facts of this case that no cause of action for termination of employment in violation of public policy exists where the statute on which the public policy is based provides its own remedy. Specifically, we conclude that because the False Claims Act, 31 U.S.C. § 3729 et seq. (2018) (FCA), provides the relevant public policy sought to be effectuated by Dibbern and provides its own adequate remedy for the employee, we decline to recognize an additional common-law tort claim for termination of employment in violation of public policy where the facts show the employee was terminated after she expressed her intention to meet with government investigators relating to an investigation of alleged improperly upcoding Medicare charges. Because no cause of action exists, we conclude that the court should have granted YSA's motions for a directed verdict and its posttrial motion for judgment notwithstanding the verdict. Accordingly, we reverse the judgment for Dibbern and remand the cause with direction to enter judgment in favor of YSA.

## STATEMENT OF FACTS

Dibbern was a longtime employee at YSA, which is owned by Dr. Daniel Growney and Dr. Ye Ye. Growney was

responsible for administrative matters, while Ye concentrated on the practice of medicine. YSA had 10 or 11 employees. Dibbern's job duties involved billing, particularly Medicare patient billing. While Growney and Ye remained ultimately responsible for Medicare billing, Dibbern assessed the code that corresponded to a particular visit or procedure and then used that code to submit the bill to Medicare for reimbursement. Dibbern explained at trial that Medicare's coding was from "two through five," with a "five" corresponding to the largest reimbursement amount from Medicare.

In February 2020, YSA received notice from the federal Office of Inspector General (OIG) that it was being audited. YSA retained an attorney and subsequently a second and third attorney from a law firm to advise them during the audit. Dibbern learned that the OIG audit was not random and was the result of a former employee's making a complaint to the OIG. At trial, the first attorney testified that she initially thought the OIG was concerned that some of the services YSA performed and billed for were not medically necessary and, for this reason, had the second attorney in her firm, who is a "certified [Medicare] coder," perform an internal audit of the records. Based on the first internal audit completed by the second attorney, the first attorney initially was not too concerned.

Dibbern requested that she be able to speak with the OIG investigator, but the first attorney recommended against it because of concerns about Dibbern's demeanor as a witness. In April 2021, the second attorney performed a second internal audit, wherein it appeared that the office of YSA and Dibbern had upcoded 73 percent of claims that were under review, which suggested fraud. Based on these findings, the first attorney recommended to Growney that YSA terminate Dibbern's employment. Growney informed Dibbern of the recommendation, and Dibbern "challenged" it, requesting that she remain employed. Two days later, on April 28, Growney took a leave of absence, and the first attorney contacted Ye about terminating Dibbern's employment.

On May 1, 2021, Dibbern reached out to the OIG investigator and requested to be interviewed. As explained at trial, when faced with increasing allegations, Dibbern contacted the OIG and believed she had a right to explain her position. Dibbern's position at trial was that she intended to talk to "a government investigator to explain" her conduct, to clear her name and to tell the truth.

On May 4, 2021, Ye gave Dibbern the option to resign or her employment would be terminated. At trial, YSA's position was that Dibbern was in charge of coding. She took the charge slips from the medical professionals, and then "she was the one who came up with the final codes, she was the one who submitted that bill to Medicare, and she was trained for that." YSA alleged Dibbern was engaged in "fraudulent conduct."

Dibbern claims that she was told she was fired. YSA introduced a signed resignation letter into evidence.

Dibbern filed this lawsuit, alleging three causes of action against defendants YSA, Growney, and Ye. In addition, Dibbern and a separate plaintiff, York Cosmetics, Inc., alleged a fourth cause of action claim, tortious interference with a business, against YSA, Growney, and Ye. The district court dismissed Dibbern's first and second causes of action on summary judgment, so that the two claims tried were Dibbern's third cause of action for wrongful termination of employment in violation of public policy and Dibbern and York Cosmetics' fourth cause of action for tortious interference with a business.

During discovery, Dibbern identified potential statutes generally as a source of public policy, including the Health Care Facility Licensure Act, see Neb. Rev. Stat. § 71-445 (Reissue 2018); the Inspector General Act of 1978, see 5 U.S.C. App. § 7(c) (2018); the Nebraska Fair Employment Practice Act; and the Nebraska Workers' Compensation Act. At trial, Dibbern testified that she believed that it was a violation of public policy to terminate her employment for wanting to cooperate in a government investigation and explain her role in the matter.

After Dibbern's case in chief, the defendants moved for a directed verdict. The district court dismissed the wrongful discharge claims against Growney and Ye but overruled the motion on the wrongful discharge claim as to YSA. It granted the motion for a directed verdict with respect to the tortious interference claim. At the close of evidence, YSA renewed its motion for a directed verdict, but the district court overruled the motion.

The jury found in favor of Dibbern on her claim based on termination of employment in violation of public policy and awarded her damages for past and future lost wages. Judgment was entered accordingly. Dibbern was not awarded compensatory damages. YSA filed a posttrial motion, claiming, inter alia, that there was an "error of law" by not directing a verdict in favor of YSA. The motion was denied. YSA appeals.

ASSIGNMENT OF ERROR

YSA assigns, restated, that the district court erred when it denied YSA's motions for a directed verdict and its posttrial motion for judgment notwithstanding a verdict.

STANDARD OF REVIEW

[1] Review of a ruling on a motion for judgment notwithstanding the verdict is de novo on the record. *132 Ventures v. Active Spine Physical Therapy, ante* p. 64, 13 N.W.3d 441 (2024).

ANALYSIS

[2] As an initial matter, we address the framework for this appeal. Although the posttrial motion was captioned as a motion for new trial, its substance stated that "the Court should have directed a verdict in favor of [YSA] on . . . Dibbern's wrongful discharge claim." The content of the motion rather than its caption controls our review. See *In re Guardianship & Conservatorship of Maronica B.*, 314 Neb. 597, 992 N.W.2d 457 (2023). In view of the foregoing, we address YSA's assignment of error as a claim that the

district court erred when it denied YSA's motion for judgment notwithstanding the verdict. As explained below, we agree with YSA that the district court erred when it denied YSA's motions for directed verdict and its postjudgment motion for judgment notwithstanding the verdict and failed to enter judgment in favor of YSA. We now reverse the judgment for Dibbern and remand the cause with direction to enter judgment in favor of YSA. See Neb. Rev. Stat. § 25-1315.03 (Reissue 2016).

By the time the case was submitted to the jury, Dibbern sought common-law relief from YSA for alleged termination of employment in violation of public policy. Although the FCA was not explicitly identified, we understand that Dibbern claimed she was discharged because she expressed her intention to cooperate with an investigation pertaining to alleged improperly upcoding Medicare charges, which would be in violation of the public policy reflected in the FCA. Dibbern's lack of awareness of the protections of the FCA is not fatal to her potential demonstration of facts that protect her under the federal act. See, e.g., *U.S. ex rel. Karvelas v. Melrose-Wakefield Hosp.*, 360 F.3d 220 (1st Cir. 2004). But, as explained below, where there is a robust federal remedy available under the FCA, as there is in this case, we decline to recognize a new state cause of action for wrongful termination based on a violation of the public policy expressed in the FCA and, therefore, agree with YSA that in the absence of a state cause of action for termination of employment in violation of public policy based on an alleged violation of the FCA, the district court erred when it denied the motions for direct verdict.

[3,4] It is undisputed that Dibbern was hired on an at-will basis. The general rule in Nebraska is that unless constitutionally, statutorily, or contractually prohibited, an employer, without incurring liability, may terminate an at-will employee at any time with or without reason. *Coffey v. Planet Group*, 287 Neb. 834, 845 N.W.2d 255 (2014). However, we have

recognized a limited public policy exception to the at-will employment doctrine. See *id*. Under the public policy exception, an employee may claim damages for wrongful discharge when the motivation for the firing contravenes public policy. See *id*.

Regarding the public policy exception, we have stated:

[I]t is important that abusive discharge claims of employees at will be limited to manageable and clear standards. The right of an employer to terminate employees at will should be restricted only by exceptions created by statute or to those instances where a very clear mandate of public policy has been violated.

*Ambroz v. Cornhusker Square Ltd.*, 226 Neb. 899, 905, 416 N.W.2d 510, 515 (1987). See, also, *Trosper v. Bag 'N Save*, 273 Neb. 855, 734 N.W.2d 704 (2007).

We have applied the public policy exception in various contexts. See *Jackson v. Morris Communications Corp.*, 265 Neb. 423, 657 N.W.2d 634 (2003) (discussing cases where we have applied public policy exception and determining that public policy exception applied when employee had been discharged in retaliation for filing workers' compensation claim). We have recognized the exception when an employee reports, in good faith, his suspicions that his employer is violating a criminal law. *Schriner v. Meginnis Ford Co.*, 228 Neb. 85, 421 N.W.2d 755 (1988). We recognized that the purpose of the Adult Protective Services Act, specifically Neb. Rev. Stat. § 28-384 (Reissue 1995), would be circumvented if employees mandated by that act to report suspected patient abuse could be threatened with discharge for making such a report. *Wendeln v. Beatrice Manor*, 271 Neb. 373, 712 N.W.2d 226 (2006).

In contrast, we determined that the Nebraska Wage Payment and Collection Act was primarily remedial for enforcing existing rights and did not "represent a 'very clear mandate of public policy' which would warrant recognition of an exception to the employment-at-will doctrine." *Malone v. American Bus. Info.*, 262 Neb. 733, 739, 634 N.W.2d 788, 793 (2001). See, also, *Ambroz v. Cornhusker Square Ltd., supra*.

However, as recently expressed by the Iowa Supreme Court, because the tort is a narrow exception to the at-will employment doctrine, it is not enough for this court to rely on generalized concepts of fairness and justice in determining whether the tort should be allowed. See *Halbur v. Larson*, 14 N.W.3d 363 (Iowa 2024). The Iowa Supreme Court continued, stating:

> Nor is it enough for this court to merely identify a statute evidencing a public policy because all statutes are enacted to advance some public policy, presumably. Instead, this court will imply a cause of action for wrongful discharge in violation of public policy only where the public policy is "clearly defined and well-recognized" and there is a "compelling need" for a cause of action to enforce or vindicate the public policy at issue.

*Id*. at 374.

[5] As we discuss below, we agree with the widely held proposition that there is generally no compelling need to recognize an implied cause of action where a legislature has provided a means to enforce or vindicate the public policy at issue. See 1A C.J.S. *Actions* § 14 n.55 (1985). The Iowa Supreme Court further observed: "'[W]hen the legislature includes a right to civil enforcement in the very statute that contains the public policy a common law claim would protect, the common law claim for wrongful discharge in violation of public policy becomes unnecessary.'" *Halbur v. Larson*, 14 N.W.3d at 375. We agree with this reasoning. We therefore conclude that a common-law claim for termination of employment in violation of public policy is unavailable in this case because the statute that contains the public policy, the FCA, provides its own remedy.

It has been said:

> The FCA, 31 U.S.C. §§ 3729-3733, was enacted in 1863 to remedy rampant fraud by suppliers of goods to the Union Army. The purpose of the FCA is to "broadly protect the funds and property of the Government from fraudulent claims, regardless of the particular form, or

function, of the government instrumentality upon which such claims were made." The statute imposes liability on anyone who knowingly submits a false claim to the government or causes another to do so, or knowingly makes a false record or statement to get a false claim paid by the government.

David B. Chaffin & Jonah S. Levinson, *The False Claims Acts and the Public Policy Exception: A Match Not Made in Heaven*, 104 Mass. L. Rev. 1, 4 (2023). In case law, it has been noted that the purpose of the FCA is "to discourage fraud against the government [and] to encourage those with knowledge of fraud to come forward." *Neal v. Honeywell, Inc.*, 826 F. Supp. 266, 269 (N.D. Ill. 1993) (citing H.R. Rep. No. 660, 99th Cong., 2d Sess. (1986)).

[6] To effectuate the foregoing purposes, the FCA provides various enforcement provisions and protections to individuals who further the goals of the FCA. Specifically, 31 U.S.C. § 3730(h) provides a remedy to employees who are harmed by their employer in retaliation for actions taken in furtherance of the FCA. The retaliation provision of the FCA, 31 U.S.C. § 3730(h), states:

(1) . . . Any employee . . . shall be entitled to all relief necessary to make that employee . . . whole, if that employee . . . is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee . . . or associated others in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter.

(2) . . . Relief under paragraph (1) shall include reinstatement with the same seniority status that employee . . . would have had but for the discrimination, 2 times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and

reasonable attorneys' fees. An action under this subsection may be brought in the appropriate district court of the United States for the relief provided in this subsection.

In our view, the FCA's antiretaliation provisions provide comprehensive and adequate remedies, including damages and reinstatement. These are robust remedies that vindicate the public policy in the FCA.

As noted, the proposition that it is not necessary to recognize a common-law exception where the statute containing the public policy also contains a remedy is widely recognized, including matters involving Medicaid or Medicare and the FSA. For example, in the health care setting, in *U.S. ex rel. Lockyer v. Hawaii Pacific Health*, 490 F. Supp. 2d 1062, 1081 (D. Haw. 2007), the federal court quoted the Hawaii Supreme Court in *Ross v. Stouffer Hotel Co. (Hawai'i) Ltd., Inc.*, 76 Haw. 454, 879 P.2d 1037 (1994), stating:

"Absent a clear expression of legislative intent to the contrary, we think it is both unnecessary and unwise to permit a judicially created cause of action, which is designed to promote a specific public policy in a 'narrow class of cases,' to be maintained where the policy sought to be vindicated is already embodied in a statute providing its own remedy for its violation."

The proposition has been widely recognized elsewhere. See, e.g., *Tracy v. Northrop Grumman Systems Corp.*, No. 10-3930, 2011 WL 6965839 (6th Cir. Dec. 21, 2011); *Tsahas v. Community Foundation of Northwest Indiana, Inc.*, No. 2:21 CV 279, 2023 WL 4763139 (N.D. Ind. July 25, 2023); *Jones v. D.C. Water & Sewer Auth.*, 943 F. Supp. 2d 90 (D.D.C. 2013); *Osborn v. Professional Services Industries Inc.*, 872 F. Supp. 679 (W.D. Mo. 1994); *Crews v. Memorex Corp.*, 588 F. Supp. 27 (D. Mass. 1984); *Halbur v. Larson*, 14 N.W.3d 363 (Iowa 2024); *Wiles v. Medina Auto Parts*, 96 Ohio St. 3d 240, 773 N.E.2d 526 (2002); *Burnham v. Karl and Gelb, P.C.*, 252 Conn. 153, 745 A.2d 178 (2000); *Makovi v. Sherwin-Williams*

*Co.*, 316 Md. 603, 561 A.2d 179 (1989); *Allen v. Safeway Stores Inc.*, 699 P.2d 277 (Wyo. 1985).

Further, it has been observed that a new cause of action could interfere with the FCA. Commentators have noted that a new separate cause of action would undermine legislative preference, lead to duplicative remedies, and interfere with provisions of the FCA such as its "qui tam" opportunities. See David B. Chaffin & Jonah S. Levinson, *The False Claims Acts and the Public Policy Exception: A Match Not Made in Heaven*, 104 Mass. L. Rev. 1, 8 (2023).

As noted, we are inclined to limit the Nebraska exceptions to at-will employment. We are aware some other state courts have held to the contrary and created a cause of action under similar circumstances. See, e.g., *Palmer v. Brown*, 242 Kan. 893, 900, 752 P. 2d 685, 689-90 (1988) (in Medicaid fraud setting, "holding termination of an employee in retaliation for good faith reporting of a serious infliction of such rules, regulations, or the law by a co-worker or an employer to either company management or law enforcement officials (whistleblowing) is an actionable tort"). Nevertheless, we conclude that because the existence of the public policy and remedy are both found in the FCA, and the statutes Dibbern has identified are too general to meet the standard articulated in *Ambroz v. Cornhusker Square, Ltd.*, 226 Neb. 899, 416 N.W.2d 510 (1987), it is not necessary for us to create an additional exception, and accordingly, we decline to recognize a common-law claim for termination of employment in violation of public policy in the matter before us. And for completeness, we state that because no claim based on 31 U.S.C. § 3730(h) was raised below, we make no comment regarding state concurrent jurisdiction of a case under that section.

## CONCLUSION

Because we conclude on the facts of this case that no new common-law cause of action for termination of employment in violation of public policy exists where the statute on which

the public policy is based provides its own remedy, we conclude that the district court should have directed a verdict and granted YSA's motion for judgment notwithstanding the verdict. We reverse the judgment for Dibbern and remand the cause with direction to enter judgment in favor of YSA.

Reversed and remanded with direction.