THOMAS BOWLEY, APPELLANT AND CROSS-APPELLEE, V. W.S.A., INC., A MINNESOTA CORPORATION, AND THOMAS ADAMSON, AN INDIVIDUAL, APPELLEES AND CROSS-APPELLANTS.

645 N.W.2d 512

Filed June 7, 2002. No. S-01-097.

Robert E. O'Connor, Jr., for appellant.

Thomas A. Grennan and Donald P. Dworak, of Gross & Welch, P.C., for appellees.

HENDRY, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.

CONNOLLY, J.

In this libel action, Thomas Bowley appeals from the district court's order granting a motion for a new trial. The appellees, W.S.A., Inc., and Thomas Adamson, cross-appeal. Adamson sent a letter to Bowley's employer, and Bowley was later terminated from his employment. W.S.A. and Adamson's motion for a directed verdict was overruled, and the jury found for Bowley and awarded damages in the amount of $150,000.

The court found that the jury awarded excessive damages and sustained W.S.A. and Adamson's motion for a new trial. Bowley contends that there was sufficient evidence to support the jury's award of damages. On cross-appeal, W.S.A. and Adamson contend that Bowley failed to prove that he was terminated because of the letter and that he failed to plead and prove special damages. Thus, W.S.A. and Adamson contend that the court erred in failing to grant their motion for a directed verdict.

We reverse, and remand because sufficient evidence was presented that showed the jury verdict was not a result of passion or prejudice.

## BACKGROUND

Bowley filed a petition alleging a cause of action for libel per se and libel per quod. He alleged that after Adamson sent a letter to Bowley's employer, he was terminated from his employment and had difficulty obtaining new employment. He alleged that as a result, he suffered general and special damages.

At trial, Bowley testified that he was employed as a general manager for Harmon Glass (Harmon) from 1989 until September 1993. In September 1993, he was paid about $36,000, had various benefits, and received raises for performance. He did not have an employment agreement with Harmon and did not make any formal agreements with Harmon regarding confidentiality or trade secrets. Adamson was a chief executive officer of W.S.A., a division of a holding company that included Harmon. Thomas Hill was Bowley's direct supervisor at Harmon.

Bowley testified that in August 1993, Hill and Adamson came to the store he managed and informed him that it would be sold. The three men then met with Frank Charles Weaver II, the owner of another glass company, about selling the store to Weaver. Bowley testified that he had experienced problems with Weaver in the past. According to Bowley, Weaver complained to Bowley's supervisors when Bowley out-bid Weaver on contracts. Bowley had also stopped purchasing wholesale products from Weaver. According to Bowley, he did not think Weaver would offer him a job and he did not want to work for Weaver. He testified that the meeting did not lead to an agreement regarding the sale. He also stated that Adamson became upset because Weaver would not sign a purchase contract and that Adamson slammed his briefcase shut in disgust. Bowley said that after the meeting, he provided Weaver with information that was requested about the sale.

Bowley testified that after the meeting, he suggested that employees of Harmon not be immediately told about the sale. He said he did not tell any of the employees about the sale, but that some employees did overhear another person discuss it. Eventually, several employees found out about the possible sale.

Bowley testified that he had previously been offered a job with Harding Glass (Harding), a competitor of Harmon. The record shows that Hill knew that Bowley had been solicited by Harding and had no complaints with Bowley's seeking a job from Harding. Bowley contacted Harding about a position and met with Danny Grim, a vice president of Harding. During the interview process, Bowley took Grim and Bob Hardwick, another vice president of Harding, through the Harmon building and discussed the possibility of Harding's leasing the building.

He said that he did so with the permission of an interim manager at Harmon. He also told Grim and Hardwick about the negotiations between Harmon and Weaver and testified that he had cleared that information with Hill.

On September 1, 1993, Grim sent Bowley a letter offering him a job with Harding. The letter described the job position as "Regional Manager of Retail operations in Omaha" and listed a base salary of $37,700, a base bonus of $9,400, and a car allowance of $4,080. The letter listed benefits of vacation, profit sharing, 401K, and disability insurance. Bowley stated that his understanding was that he would oversee all of the retail stores in Omaha. Bowley then told Harmon that he was leaving to accept the offer at Harding. At the request of Harmon, he continued to work there for 2 more weeks.

Bowley started work at Harding on September 13, 1993. He stated that he met with Frederick W. Pierce III, the president of Harding. According to Bowley, Pierce told him that a shop known as the South 90th Street location was operating at an 8-percent profit margin and would be closed if it remained at 8 percent. Bowley said that Pierce told him that he was to work on that shop first and could do whatever it took to get the numbers up. Pierce did not discuss with him any change in his job title or job duties. He testified that while he worked for Harding, he was always paid as a regional manager.

The next night, Hill, Bowley's former supervisor at Harmon, called him and warned him that a letter was going to be sent to someone at Harding and that it was not going to paint him in a good light. On September 15, 1993, Pierce faxed him a copy of a letter that had been sent to him. The letter was from Adamson and was addressed to Bowley, with copies sent to Hill and Pierce. The letter stated:

Dear Tom:

I am very disappointed.

A few weeks ago you asked me to trust you, which I did without hesitation. Now that trust has been broken several times by your continual attempts to undermine our efforts to sell/transition the Omaha operation.

Perhaps you were mistreated in the past. I do not know. You never said you were.

Perhaps you see this as a way to impress your new employer. Again, I do not know. I am not familiar with their method of operation or what they think of you.

I do know that trust is an essential part of any business relationship, whether it is with a coworker, investor, supplier or customer. Are you a person that can be trusted, Tom? You should give it some thought—your future will depend on it.

Bowley testified that Pierce and Hardwick called him to discuss the letter and that he was on the telephone with them for 30 to 45 minutes discussing the letter. He discussed the letter again with both men about 4 weeks later. Bowley sent several letters to Adamson seeking a retraction and received no response.

According to Bowley, immediately after his employers received the letter, his duties were limited. He was told to oversee only a single shop and was told not to engage in any new construction projects or contact insurance companies. He stated that there was a change in the way he was treated after the letter was received and that he was excluded from meetings and lunches.

Bowley testified that Grim claimed that there were several issues that concerned him other than the letter. First, there was an issue regarding the use of scratch pads instead of inventory sheets. According to Bowley, he never used scratch pads, but had a problem with some of the employees doing so. Bowley stated that scratch pads were also used at all of the Omaha locations. Second, there was money missing from the cash drawer. Bowley testified that he accounted for it by showing Grim that there were two $100 bills placed underneath the drawer. Third, Grim questioned if sales had been raised. Bowley testified that he did a good job at Harding; that he increased sales by 25 percent; and that by organizing inventory, he realized an inventory gain of $5,000 for the month of November. Bowley also stated that he could not bring in new business because his duties had been limited and he was unable to call on customers. The record contains a letter sent by Bowley to Grim suggesting ways Harding's business could be improved. Bowley concedes that Grim did not mention the letter sent by Adamson at the termination meeting.

Bowley testified that after he was terminated from his employment at Harding, he was unable to find employment with a glass company, either as a manager or in sales. He first applied to the

top 10 or 12 stores and then applied to every glass company in the telephone book, which was about 50 shops. He never obtained employment as a manager, but did find work as a journeyman glazer. He stated that his current rate of pay is $15.50 per hour and that he has health insurance, but does not have paid vacations, paid holidays, a car allowance, or an employer-contributing pension plan.

In a motion in limine before trial, W.S.A. and Adamson sought to exclude evidence consisting of Bowley's tax returns and W-2 forms for the years 1993 to 2000. The documents were not allowed into evidence during trial. W.S.A. and Adamson later moved to strike Bowley's testimony regarding his income. The motion was overruled.

After Bowley testified, he moved to amend his pleadings to conform to the proof. The motion was sustained. Bowley presented no other evidence, and W.S.A. and Adamson moved for a directed verdict. The motion was denied.

Adamson testified that he had discussed confidentiality regarding the sale with Bowley and that it had been Bowley's suggestion to keep the sale secret. Adamson was concerned that his competitors would learn about the sale and that Harmon would lose customers, employees, and its telephone number. He stated that he sent the letter to Harding after Weaver had contacted him complaining that Harding was encouraging Bowley to interfere with the sale to Weaver. He said he sent a copy to Pierce, Harding's president, because he believed that Bowley's actions were motivated by Harding. Adamson conceded that Bowley did not have an employment or confidentiality contract with Harmon.

Weaver testified that he had expressed to Adamson the importance about confidentiality of the sale. He stated that confidentiality was discussed when he met with Bowley, Hill, and Adamson and stated that Bowley did not provide him with requested information after the meeting. He said that he would not have hired Bowley.

Weaver stated that he contacted Adamson about Bowley when he learned that two of Weaver's employees were going to work at Harding. He was "very hot" and told Adamson that his people were getting stolen.

Pierce testified that the letter had nothing to do with Bowley's termination. Hardwick testified that the letter had a positive effect on him and made him think that Harding may have picked up a good man and that Adamson was upset that he had lost him. Both stated that they generally were not involved in the termination of employees.

Grim testified that when he first hired Bowley, he was looking for someone to oversee the three Omaha stores. He initially gave Bowley one store to run and told Bowley that if he did well there, he would increase Bowley's level of responsibility. According to Grim, Bowley agreed to this. He stated that Bowley was paid a regular manager's pay.

Grim said that he learned that Bowley was using scratch pads instead of formal invoices and that he directed Bowley to use invoice sheets. He later learned that invoice forms were still not being used properly after he directed Bowley to do so. An employee of Harding also testified that Bowley did not use invoices properly. Grim stated that he asked Bowley on one occasion to explain how he was making the store profitable and that Bowley gave him no answer and instead complained that Harding had a bad reputation and that the employees were incompetent. Grim also stated that the cash register was long on money and that he suspected that some invoices were not being written up. Thus, he was concerned that the store was not accounting for cash properly. Grim stated that he terminated Bowley's employment from Harding because Bowley failed to follow company procedures and that the letter had nothing to do with it. On cross-examination, he admitted that Bowley had reported to him that employees were failing to use invoices properly and had expressed concerns that some employees might be stealing money from the company.

At the end of the testimony, W.S.A. and Adamson renewed their motion for a directed verdict and it was denied. The jury returned a verdict for Bowley and awarded damages in the amount of $150,000. W.S.A. and Adamson moved to set aside the verdict and moved for a new trial, arguing that there was no evidence that the letter caused Harding to terminate Bowley's employment and that the verdict was excessive. The district

court granted the motion for a new trial. Bowley appeals, and W.S.A. and Adamson cross-appeal.

## ASSIGNMENTS OF ERROR

Bowley, rephrased, assigns that the district court erred in sustaining the motion for a new trial. On cross-appeal, rephrased, W.S.A. and Adamson assign that the district court erred in overruling their (1) motion for a directed verdict and (2) motion to strike testimony regarding Bowley's income.

## STANDARD OF REVIEW

■A motion for new trial is addressed to the discretion of the trial court, whose decision will be upheld in the absence of an abuse of that discretion. *Paulk v. Central Lab. Assocs.*, 262 Neb. 838, 636 N.W.2d 170 (2001); *Maxwell v. Montey*, 262 Neb. 160, 631 N.W.2d 455 (2001).

■A directed verdict is proper at the close of all the evidence only when reasonable minds cannot differ and can draw but one conclusion from the evidence, that is to say, where an issue should be decided as a matter of law. *Mondelli v. Kendel Homes Corp.*, 262 Neb. 263, 631 N.W.2d 846 (2001).

## ANALYSIS

### MOTION FOR DIRECTED VERDICT

On cross-appeal, W.S.A. and Adamson contend that the court should have sustained their motion for a directed verdict because Bowley failed to prove that the letter caused special damages. W.S.A. and Adamson also contend that Bowley failed to plead and prove special damages.

■ Special damages in a libel action are damages that the "plaintiff alleges and proves were suffered in respect to his or her property, business, trade, profession, or occupation as the direct and proximate result of the defendant's publication." Neb. Rev. Stat. § 25-840.01 (Reissue 1995).

■ When the record contains evidence about which reasonable minds could differ and when the record further sustains a finding for the plaintiff, the record precludes the entry of a directed verdict against the plaintiff. *Rod Rehm, P.C. v. Tamarack Amer.*, 261 Neb. 520, 623 N.W.2d 690 (2001).

Here, Bowley alleged that after Adamson sent a letter to Harding, he was terminated from his employment and had difficulty obtaining new employment. He alleged that as a result, he suffered general and special damages. At trial, Bowley successfully moved to amend his petition to conform to the proof. Under these facts, we determine that he pled special damages.

At trial, Bowley testified that he was treated differently immediately after his employers received the letter. Bowley also testified that he had difficulty in finding employment as a manager and that he earned less in his new employment. Bowley's duties were reduced, and he was excluded from meetings and lunches. His testimony contradicted evidence that Harding terminated his employment for reasons other than the letter. For example, Bowley contradicted Grim's testimony that Bowley improperly used invoice forms, that he improperly accounted for money, and that he failed to increase sales. Although W.S.A. and Adamson presented evidence that directly contradicted Bowley's testimony, this court does not reweigh the evidence. Instead, the party against whom a motion for directed verdict is made is entitled to all reasonable inferences deducible from the evidence. See *Suburban Air Freight v. Aust*, 262 Neb. 908, 636 N.W.2d 629 (2001). The court concluded that the issue of liability was properly a question of fact for the jury. We agree. We determine that when all reasonable inferences are afforded to Bowley's case, the court was correct in overruling W.S.A. and Adamson's motion for a directed verdict.

### MOTION TO STRIKE TESTIMONY REGARDING INCOME

W.S.A. and Adamson next contend that Bowley's testimony about his income was irrelevant and highly prejudicial because there was a lack of evidence that the letter caused any loss of income. Thus, W.S.A. and Adamson contend that the district court erred in failing to strike the testimony.

We have already determined that there was evidence that the letter caused Bowley to lose income. Evidence of Bowley's earnings before and after his employment was terminated was relevant to determining the amount of damages he incurred and was not unduly prejudicial. We determine that this assignment of error is without merit.

## MOTION FOR NEW TRIAL

Bowley contends that the jury's verdict was supported by the evidence and that the court erred in granting W.S.A. and Adamson's motion for a new trial.

Under Neb. Rev. Stat. § 25-1142 (Cum. Supp. 2000), a verdict "shall be vacated and a new trial granted on the application of the party aggrieved for any of the following causes affecting materially the substantial rights of such party: . . . (4) excessive damages, appearing to have been given under the influence of passion or prejudice." In reviewing the district court's order granting a new trial, the decision of the trial court will be upheld in the absence of an abuse of discretion. *Holmes v. Crossroads Joint Venture*, 262 Neb. 98, 629 N.W.2d 511 (2001).

Here, the jury was instructed that Bowley could recover both general and special damages, including loss of income for a reasonable period after termination. Bowley testified that he was unable to secure employment as a manager or in sales. At the time of trial, almost 7 years after Bowley was terminated from Harding, he was working in a position as a glazer, earning $15.50 per hour. The evidence showed that at Harding, Bowley earned $37,700 per year, along with a base bonus of $9,400 and a car allowance of $4,080. He also testified that he no longer had certain benefits such as paid vacation or a pension plan. When the income differential, lost bonus, and lost car allowance are considered over a period of 6 years 11 months—the amount of time between when Bowley's employment was terminated and trial—a jury could reasonably conclude that Bowley's lost income exceeded $130,000. When the additional value of benefits are included, an award of $150,000 is supported by the evidence. Under these circumstances, the jury's verdict does not appear to have been given under the influence of passion or prejudice. We conclude that the court was incorrect when it determined that there was insufficient evidence to support the jury verdict. Accordingly, the court abused its discretion when it sustained W.S.A. and Adamson's motion for a new trial.

## CONCLUSION

We conclude that the district court was correct in overruling W.S.A. and Adamson's motion for a directed verdict and in

refusing to strike testimony regarding Bowley's income. We determine, however, that the district court abused its discretion when it sustained W.S.A. and Adamson's motion for a new trial. Accordingly, we reverse, and remand with instructions that judgment be entered in this cause.

REVERSED AND REMANDED.