We find *Farmland Foods* helpful to our disposition here. The department's order, while somewhat unclear, made the correct findings of fact to support a change in ownership under rule 3-C-1(a)(2), discussed that section, and essentially concluded that it had been met. The order simply failed to note that finding in its conclusions of law section of the order.

We therefore conclude that in addition to the change in ownership under rule 3-C-1(a)(4), there was a change in ownership under rule 3-C-1(a)(2) due to the asset sale and taking over of the business operations of Omaha Beef, LLC, by Gridiron. While this was not a basis for the department's decision, it is supported by the findings made by the department.

Gridiron's second assignment of error is without merit.

## VI. CONCLUSION

The decision of the district court is affirmed.

Affirmed.

———————————

First Express Services Group, Inc., appellee, v. Arlene
A. Easter and Mark T. Easter, appellants,
and Miller Services Agency, Inc., doing
business as Davidson Insurance and
Real Estate, appellee.
___ N.W.2d ___

Filed November 22, 2013.    No. S-12-304.

1. **Summary Judgment: Moot Question: Appeal and Error.** The denial of a summary judgment motion generally becomes a moot issue on appeal after a final trial on the merits.
2. **Judgments: Verdicts: Appeal and Error.** In reviewing rulings on motions for directed verdict and judgments notwithstanding the verdict, an appellate court gives the nonmoving party the benefit of all evidence and reasonable inferences in his or her favor, and the question is whether a party is entitled to judgment as a matter of law.
3. **New Trial: Appeal and Error.** Regarding motions for new trial, an appellate court will uphold a trial court's ruling on such a motion absent an abuse of discretion.
4. **Appeal and Error.** An appellate court will not consider an issue on appeal that was not presented to or passed upon by the trial court.

5. ____. Generally, an appellate court disposes of a case on the theory presented in the trial court.

6. ____. When a party raises an issue for the first time on appeal, an appellate court will disregard it because a lower court cannot commit error in resolving an issue never presented and submitted to it for disposition.

7. **Trade Secrets: Restrictive Covenants.** Courts are reluctant to protect customer lists to the extent that they embody information that is readily ascertainable through public sources. Only where time and effort have been expended to identify particular customers with particular needs or characteristics will a list be protected. Such lists are distinguishable from mere identities and locations of customers that anyone could easily identify as possible customers.

8. **Breach of Contract: Unjust Enrichment.** A party cannot be liable for both breach of contract and unjust enrichment for the same conduct.

9. ____: ____. There is no question regarding the priority of a claim for breach of contract and a claim for unjust enrichment flowing from the same conduct; liability under a contract displaces liability under an unjust enrichment theory.

Appeal from the District Court for Otoe County: RANDALL L. REHMEIER, Judge. Affirmed in part as modified, and in part reversed.

Matthew D. Hammes, of Locher, Pavelka, Dostal, Braddy & Hammes, L.L.C., for appellant Arlene A. Easter.

Abbie J. Widger and Cameron E. Guenzel, of Johnson, Flodman, Guenzel & Widger, for appellant Mark T. Easter.

Heather Voegele-Andersen and David A. Yudelson, of Koley Jessen, P.C., L.L.O., for appellee First Express Services Group, Inc.

HEAVICAN, C.J., WRIGHT, CONNOLLY, and McCORMACK, JJ., and MOORE, RIEDMANN, and BISHOP, Judges.

CONNOLLY, J.

## I. SUMMARY

Arlene A. Easter sold crop insurance for First Express Services Group, Inc. (First Express). In 2009, however, Arlene resigned from First Express and went to work for her son, Mark T. Easter, a part owner of a competing agency. When she resigned, Arlene took a First Express customer list and transferred many of First Express' customers to Mark's agency. When First Express discovered this, it sued Arlene for breach

of contract and it sued Arlene, Mark, and Mark's agency for misappropriation of trade secrets and unjust enrichment. A jury found for First Express on all claims. Arlene and Mark (but not Mark's agency) appealed. The primary issues are (1) whether Arlene preserved for review her arguments challenging the enforceability of the underlying contract, (2) whether the customer list was a trade secret, and (3) whether the theory of unjust enrichment applied.

We will explain our holding with specificity in the following pages, but, briefly stated, it is as follows:

• Arlene did not challenge the enforceability of the underlying contract in the district court, so she cannot do so now for the first time on appeal.

• The customer list was not a trade secret, because the customers' identities and contact information were ascertainable from public sources and because the other information on the list was also ascertainable by proper means.

• The theory of unjust enrichment could not apply to either Arlene or Mark. Arlene is already liable for breach of contract, and the corporate veil protects Mark.

Therefore, Arlene is liable only for the portion of the judgment attributed by the district court to the breach of contract claim, which is $360,121.72 (after applying the setoff of $5,759.28). We modify the judgment against her accordingly. And because Mark is not liable for either misappropriation of trade secrets or unjust enrichment, we reverse the judgment against Mark.

## II. BACKGROUND

In 1979, Arlene began selling crop insurance, on her own. In 1986, she began working full time at the Otoe County National Bank in Nebraska City, Nebraska, but continued selling crop insurance independently as Arlene Easter Insurance. In 1990, Grant Gregory purchased the bank (through a holding company) and kept Arlene on as a bank employee. Gregory also hired her as an independent crop insurance agent for First Express, which opened an office in the bank. Arlene brought her crop insurance customers with her to First Express.

1. Arlene's Agreement
With First Express

Arlene and Gregory negotiated the terms of her business relationship with First Express, which they reduced to a written agreement. The agreement contained several notable provisions. In paragraph 7, Arlene agreed that "[a]ll renewals and goodwill arising out of the conduct of the insurance agency business shall be and remain the property of [First Express]; provided, however, that [Arlene] shall be entitled to retain the customers listed on Exhibit 'A'." It is undisputed, however, that there was no exhibit A attached to the agreement, though Arlene claimed that exhibit A existed. Throughout these proceedings, no one could produce a copy of exhibit A, although Arlene did attempt to recreate it.

In paragraph 8, Arlene acknowledged that she would be handling (and adding to) "confidential information of a special and unique nature and value relating to [First Express'] trade secrets, and customer lists, as well as the nature and type of products used and preferred by [First Express'] customers." Arlene agreed that she would not, "at any time, during or following the term of this Agreement, directly or indirectly divulge or disclose any of the confidential information that [had] been obtained by [Arlene] as a result of the services provided."

Finally, in paragraph 9, Arlene agreed to a covenant not to compete, among other things. But the parties, during trial, agreed to redact the covenant not to compete from the agreement, presumably because it was unenforceable and because First Express abandoned its claim based on the covenant. The pertinent remaining portions of paragraph 9 provided that during the term of the agreement and for 5 years after, Arlene would not "divulge, directly or indirectly, to any other insurance company, broker, or agency any information or lists or records with respect to business of [First Express], and [Arlene] would], upon termination of this Agreement, properly return to [First Express] all records, lists and prospect cards."

Paragraph 9 also prohibited Arlene from allowing "anyone to see or copy any of the cards or records, which [were] acquired, made or used while [Arlene] was retained by [First

Express], or in any other way do any act contrary to the interest of [First Express]." It acknowledged, however, that "the customer's [sic] listed on Exhibit 'A' were customers of [Arlene] prior to [Arlene's] retainer by [First Express]" and that, were the agreement terminated, Arlene would be "entitled to continue to write insurance for the customers listed on Exhibit 'A'." The jury based its finding that Arlene breached her contract on her taking and using the customer list in violation of the provisions in paragraphs 8 and 9 (excluding the covenant not to compete).

### 2. Arlene Resigns and Takes Customer List

Arlene worked for both the bank and First Express for many years. But in separate letters dated November 30, 2009, she resigned from both positions effective December 31, "[d]ue to health reasons." She personally delivered the bank resignation letter to the bank president, but the letter to First Express did not reach Gregory until sometime in January 2010.

When she resigned, Arlene took with her a First Express customer list. The list was an "Agency Commission Statement" from one of the companies for which First Express wrote crop insurance. This list apparently was available only by logging in using First Express identification and a password. The document listed all of First Express' customers with that company and contained other significant information about each customer. The document included customers' names and their 2009 information: what crops the farmers had, what counties the crops were located in, what insurance plan the farmers bought, what percentage of coverage each farmer had, and what commission First Express had earned. First Express considered this information both confidential and valuable.

### 3. Arlene Transfers Customers to Mark's Agency and First Express Sues

Shortly after her resignation, Arlene started transferring First Express' customers to her at Mark's agency. In late January 2010, First Express began receiving transfer notices

from those customers. By March 15, the critical deadline in crop insurance, 90 percent of Arlene's customers had transferred to Mark's agency. Upon discovering this, First Express sued Arlene for breach of contract and sued Arlene, Mark, and Mark's agency for misappropriation of trade secrets and unjust enrichment. First Express based all of its claims on Arlene's alleged use of the customer list to transfer her customers.

### 4. Evidence and Testimony at Trial

Evidence at trial showed that because the federal government sets all the rates, different insurance agencies cannot offer different rates on crop insurance. Farmers generally choose a crop insurance agency based on the agent. A farmer must have crop coverage by March 15, and if no transfer has occurred, the policy from the previous year automatically renews with the agency from the previous year. A farmer can transfer his or her crop insurance coverage from one agency to another by filling out and signing a transfer form. A transfer form has blanks for the customer's basic information such as name, address, Social Security number, and spouse. It also has blanks regarding the crop insurance the customer wants, including the county the crops are in, the type of crops, the insurance coverage level, and the type of insurance plan.

Testimony at trial indicated that the information on the customer list would have been helpful, though not necessary, to fill out the transfer form. Much of the information on the customer list was obtainable from other sources. Moreover, the transfer form did not need to be filled out completely to actually transfer the customer; rather, only the customer's signature and possibly a few other pieces of information were necessary. The rest of the information could be added or changed later, if done before March 15. And once the insurance carrier received a customer's transfer form, the customer's prior crop insurance information became available to the new agent on the carrier's Web site.

Arlene testified that when she submitted her resignations, she intended to continue selling crop insurance from her home. But then her son, Mark, a part owner of an insurance

agency, asked her to come work for him. On January 12, 2010, Arlene became an agent for Mark's agency. On or about January 15, Arlene sent a letter to former First Express customers, informing them of her resignation and soliciting their business.

Arlene testified further that she took the list only because she was concerned First Express would not pay her all the commissions due her after her resignation. She testified that with the list, she could prove what First Express owed her. She acknowledged that the information on the list could have been used in filling out transfer forms, but she claimed she used the list only for the names of her customers. She insisted that additional information was needed to transfer a customer and that all the information on the list could be obtained in other ways, including by simply talking to the farmer. Arlene apparently had excellent relationships with her customers; several testified that Arlene was an exceptional agent and that they would have followed her wherever she went.

Arlene did admit to making handwritten notes on the list, including notations that she sent solicitation letters to or called the customers. She also admitted that she filled out the transfer forms for many of her customers and then later obtained the customer's signature. Arlene testified that she never gave the information from the customer list to Mark.

Mark testified that although Arlene mentioned leaving First Express in 2008 and 2009, he did not specifically discuss her future plans with her until after she resigned from First Express. He had reviewed her contract with First Express in 2008 or 2009. He testified that although he knew she wanted to transfer her former First Express customers to his agency, he did not know she had taken the customer list. He was aware of the letters Arlene sent to her former customers and testified that Arlene brought significant new business into his agency. According to him, when his company makes more money, he makes more money as a shareholder. Mark also testified that all of the information on the customer list could be acquired either through Internet searches or by interviewing the farmers.

### 5. VERDICTS AND JUDGMENTS
#### FOR FIRST EXPRESS

A jury found for First Express on the breach of contract claim and awarded $506,035 against Arlene. It found for First Express on the Trade Secrets claim and awarded $280,320 against Arlene, $84,093 against Mark, and $56,061 against Mark's agency. The jury also found for First Express on its unjust enrichment claim and awarded $280,320 against Arlene, $84,093 against Mark, and $56,061 against Mark's agency.

The district court later entered judgment against Arlene for $506,035, against Mark for $84,093, and against Mark's agency for $56,061. The court specifically noted that Arlene was individually liable for $365,881 and jointly and severally liable with Mark for $84,093 and with Mark's agency for $56,061. Later, the court reduced the judgment against Arlene to $500,275.72 based on a setoff agreed to by the parties. We granted Mark's petition to bypass the Nebraska Court of Appeals.

## III. ASSIGNMENTS OF ERROR

Arlene assigns, restated, that the district court erred in denying her motions for summary judgment, directed verdict, judgment notwithstanding the verdict, and new trial as to First Express' claims because (1) there was no meeting of the minds as to exhibit A, rendering the agreement unenforceable; (2) the noncompete, nonsolicitation, and confidentiality provisions were overly broad and unreasonable, rendering the agreement unenforceable; (3) the customer list was, as a matter of law, not a trade secret; and (4) First Express could not sue for both breach of contract and unjust enrichment. Arlene also assigns, restated, that the court erred in (1) failing to instruct the jury that it was First Express' burden to prove the terms of the written agreement by the greater weight of the evidence and (2) failing to properly instruct the jury on the recoverable damages for First Express' claims of misappropriation of trade secrets and unjust enrichment.

Mark assigns, restated and consolidated, that the court erred in (1) denying his motions for summary judgment,

directed verdict, and judgment notwithstanding the verdict as to First Express' unjust enrichment claim because there was no evidence that he engaged in wrongful conduct and the claim improperly sought profits protected by the corporate veil; (2) denying his motions for directed verdict and judgment notwithstanding the verdict as to First Express' misappropriation of trade secrets claim because the information on the customer list was not, as a matter of law, a trade secret, and because there was no evidence Mark engaged in wrongful conduct; (3) denying his motion for new trial because the court improperly instructed the jury on unjust enrichment and recoverable damages, there was no evidence to support piercing the corporate veil, and the award against him was excessive; and (4) denying Arlene's motions for summary judgment, directed verdict, judgment notwithstanding the verdict, and new trial because there was no evidence that she misappropriated First Express' trade secrets and because her actions did not proximately cause harm to First Express.

## IV. STANDARD OF REVIEW

[1-3] Arlene's and Mark's assigned errors generally relate to the same issues at different stages of the proceedings, including denials of summary judgment, directed verdict, judgment notwithstanding the verdict, and new trial. The denial of a summary judgment motion generally becomes a moot issue on appeal after a final trial on the merits.[1] In reviewing rulings on motions for directed verdict and judgments notwithstanding the verdict, we give the nonmoving party the benefit of all evidence and reasonable inferences in his or her favor, and the question is whether a party is entitled to judgment as a matter of law.[2] Regarding motions for new trial, we will

---

[1] See, e.g., *Lesiak v. Central Valley Ag Co-op*, 283 Neb. 103, 808 N.W.2d 67 (2012); *Wendeln v. Beatrice Manor*, 271 Neb. 373, 712 N.W.2d 226 (2006).

[2] See, e.g., *Wulf v. Kunnath*, 285 Neb. 472, 827 N.W.2d 248 (2013); *Martensen v. Rejda Bros.*, 283 Neb. 279, 808 N.W.2d 855 (2012); *Snyder v. Contemporary Obstetrics & Gyn.*, 258 Neb. 643, 605 N.W.2d 782 (2000).

uphold a trial court's ruling on such a motion absent an abuse of discretion.[3]

## V. ANALYSIS

We pause to mention what is not at issue in this appeal. At no point in her brief did Arlene challenge whether her conduct proximately caused damage to First Express. Mark raised the issue in his brief in the context of First Express' claims against him, but, as will be seen below, we resolve his appeal on different grounds. Furthermore, to the extent Mark attempted to raise the issue for Arlene, he has no standing to do so because Mark and Arlene are separate parties with separate representation on appeal.

We will first address Arlene's arguments on appeal, followed by Mark's arguments. Because the jury returned multiple verdicts against Arlene and Mark, and because the district court imposed joint and several liability, we will address the validity of each individual verdict. Following that, we will address the specific judgments against Arlene and Mark.

### 1. ARLENE'S APPEAL

#### (a) Breach of Contract

Arlene argues that there was no valid, legally enforceable contract and that, therefore, she cannot be liable for breach of contract. Specifically, Arlene argues that the contract was unenforceable because (1) there was no "meeting of the minds" between the parties on exhibit A and (2) the contract's noncompete provisions were unenforceable. At oral argument, Arlene also argued that the contract was incomplete and therefore unenforceable, which, from her brief, we understand to be an extension of her "meeting of the minds" argument. But First Express argues that Arlene failed to preserve these arguments for our review. We agree.

[4] It is a longstanding rule that "[w]e will not consider an issue on appeal that was not presented to or passed upon

---

[3] See, e.g., *Bowley v. W.S.A., Inc.*, 264 Neb. 6, 645 N.W.2d 512 (2002).

by the trial court."[4] At no time during the proceedings on her motions for summary judgment, directed verdict, judgment notwithstanding the verdict, or new trial, did Arlene argue to the court that the underlying contract was unenforceable. To the contrary, she proceeded on the theory that the contract was enforceable but contested only the elements of breach, causation, and damages.

And the record provides ample support for this conclusion. For example, the court instructed the jury that "[t]his case involve[d] a contract" between Arlene and First Express and that Arlene "admit[ted] the existence of the contract but denie[d] that she breached the contract, and further denie[d] that [First Express] suffered any damage as a result of any alleged breach." Arlene did not object to these statements. Notably, too, Arlene herself counterclaimed for breach of contract (and that claim went to the jury), based on the same contract that she now argues was unenforceable. The record also reflects many instances where, had Arlene been challenging the enforceability of the contract, she would have made objections or arguments, but she did not.

Still, Arlene argues that she preserved her arguments for review. In her reply brief, Arlene argues that she "has consistently asserted in both her pleadings and sworn testimony that the alleged contract that First Express attempts to enforce is void and unenforceable."[5] She points to specific portions of the pleadings, language in the court's order on a motion for a temporary restraining order, and evidence indicating that the parties disagreed on the existence of exhibit A.

A review of those portions of the record, however, demonstrates that Arlene did not challenge the enforceability of the contract. The parties contested whether exhibit A existed and whether the parties had agreed to exhibit A. But Arlene did not argue that because there had been no "meeting of the

---

[4] See, e.g., *Gibbs Cattle Co. v. Bixler*, 285 Neb. 952, 962, 831 N.W.2d 696, 703 (2013). See, also, *Tolbert v. Jamison*, 281 Neb. 206, 794 N.W.2d 877 (2011).

[5] Reply brief for appellant Arlene at 1.

minds" on exhibit A, the contract was therefore unenforceable. And while Arlene challenged the enforceability of the covenant not to compete, she did not claim that the entire contract was unenforceable because of the covenant. We also note that to the extent Arlene's challenge to the enforceability of the contract is based on other allegedly unenforceable provisions, the record shows that Arlene proposed the redaction to the contract and proceeded to trial with those provisions included. We do not review alleged errors which the assigning party invited.[6]

[5,6] Generally, an appellate court disposes of a case on the theory presented in the trial court.[7] Arlene defended the breach of contract claim at all material times on the theory that the contract was valid (contesting only the elements of breach, causation, and damages), and she cannot now assert for the first time on appeal that the contract was unenforceable.[8] When a party raises an issue for the first time on appeal, we will disregard it because a lower court cannot commit error in resolving an issue never presented and submitted to it for disposition.[9] Because Arlene did not preserve her arguments for review on the breach of contract claim, we do not address them.

We note briefly that Arlene also argues that the court improperly instructed the jury on the breach of contract claim. Specifically, Arlene argues that the court did not instruct the jury that it was First Express' burden to prove, by the greater weight of the evidence, the "'terms of the contract.'"[10] From her brief, she premises this argument on her earlier argument regarding the lack of a meeting of the minds on exhibit A, an issue which Arlene cannot raise for the first time on appeal.

---

[6] See, e.g., *Schaneman v. Wright*, 238 Neb. 309, 470 N.W.2d 566 (1991).

[7] See, e.g., *Wise v. Omaha Public Schools*, 271 Neb. 635, 714 N.W.2d 19 (2006).

[8] See *Tolbert, supra* note 4.

[9] See, *Maycock v. Hoody*, 281 Neb. 767, 799 N.W.2d 322 (2011); *Ways v. Shively*, 264 Neb. 250, 646 N.W.2d 621 (2002).

[10] Brief for appellant Arlene at 26.

Furthermore, Arlene did not object to the breach of contract instruction on that basis, which is an additional reason she has not preserved her argument for review.[11] Because Arlene did not preserve for review her arguments challenging the breach of contract verdict, we affirm the jury's finding against her on that claim.

### (b) Misappropriation of Trade Secrets

Arlene argues that the customer list was not a trade secret because it was "nothing more than each crop insurance client's own insurance information, which was and is ascertainable by proper means and could never constitute a trade secret as a matter of law."[12] Not surprisingly, First Express argues that the information was proprietary and valuable and that it was a trade secret. We conclude, however, that because the customers' identities and contact information were ascertainable from public sources, and because the other information on the list was also ascertainable by proper means, the customer list was not a trade secret.

Nebraska's Trade Secrets Act[13] (the Act) defines a trade secret as

> information, including, but not limited to, a drawing, formula, pattern, compilation, program, device, method, technique, code, or process that:
>
> (a) Derives independent economic value, actual or potential, from not being known to, and not being ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and
>
> (b) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.[14]

There is no dispute that the customer list was a "compilation," and Arlene does not argue that there were not reasonable

---

[11] See, *State v. Valverde*, 286 Neb. 280, 835 N.W.2d 732 (2013); *Robinson v. Dustrol, Inc.*, 281 Neb. 45, 793 N.W.2d 338 (2011).

[12] Brief for appellant Arlene at 28.

[13] Neb. Rev. Stat. §§ 87-501 through 87-507 (Reissue 2008).

[14] § 87-502(4).

efforts to maintain its secrecy. Instead, Arlene contends that the customer list cannot be a trade secret as a matter of law because it does not derive economic value from "not being ascertainable by proper means by . . . other persons."

Although the Act is based on the Uniform Trade Secrets Act,[15] the Act's definition of a trade secret differs significantly from the uniform act. Under the uniform act, a trade secret is something that derives independent economic value "'from not being [generally] known to, and not being [readily] ascertainable by proper means by, other persons . . . .'"[16] The Legislature, however, deleted the qualifiers "generally" and "readily" from the statutory definition.[17] And as one commentator noted, Nebraska's statute greatly narrows the definition of a trade secret: "[U]nder the literal terms of the . . . language, if an alleged trade secret is *ascertainable at all* by any means that are not 'improper,' the would-be secret is peremptorily excluded from coverage under the [Act]."[18] The question, then, is whether the information on the list here was ascertainable by proper means.

We give statutory language its plain and ordinary meaning.[19] Applying the language here, the customer list does not qualify as a trade secret under § 87-502(4) because all of the information on the list was ascertainable by proper means. Mark testified, and no one disputed, that simple Internet searches could identify which farmers farmed what land and could provide contact information for those farmers. Arlene also demonstrated that she could recite most of her customers' information from memory.[20] The rest of the information on the list essentially reflected the farmers' previous insurance

---

[15] See Gerald B. Buechler, Jr., *Revealing Nebraska's Trade Secrets Act*, 23 Creighton L. Rev. 323 (1989-90).

[16] *Id*. at 328 n.28.

[17] See § 87-502(4)(a).

[18] Buechler, *supra* note 15 at 339 (emphasis in original).

[19] See, e.g., *Lozier Corp*. *v. Douglas Cty. Bd. of Equal*., 285 Neb. 705, 829 N.W.2d 652 (2013).

[20] See *Radiology Servs*. *v. Hall*, 279 Neb. 553, 780 N.W.2d 17 (2010).

coverage on their crops. It is undisputed that the individual farmers had all of that information and that Arlene could have obtained the information from them through a simple telephone call.[21] Also, once a customer changed agencies, all of the customer's prior insurance information became available from the insurance carrier's Web site. Though the exact information required to transfer a customer is a bit unclear, the record shows that, at most, all that is required is the customer's name, address, type of crops, and signature, all of which are ascertainable by proper means.

[7] Concluding that this particular customer list is not a trade secret conforms with our decision in *Home Pride Foods v. Johnson*.[22] In that case, we noted that "[c]ourts are reluctant to protect customer lists to the extent that they embody information that is readily ascertainable through public sources."[23] We noted further that only "where time and effort have been expended to identify particular customers with particular needs or characteristics" will a list be protected.[24] And we noted that "[s]uch lists are distinguishable from mere identities and locations of customers that anyone could easily identify as possible customers."[25]

In holding that the customer list in *Home Pride Foods* was a trade secret, we affirmed the lower court's finding that the information on the list was not ascertainable through proper means. We noted that the record showed that "the customer list contained information not available from publicly available lists,"[26] such as which customers had previously placed food orders, along with the amount of those orders. We stated that "[w]ith such information, a competitor could undercut Home Pride [Food's] pricing."[27] And we emphasized that "if the

---

[21] See *Harvest Life Ins. Co. v. Getche*, 701 N.E.2d 871 (Ind. App. 1998).

[22] *Home Pride Foods v. Johnson*, 262 Neb. 701, 634 N.W.2d 774 (2001).

[23] *Id.* at 709, 634 N.W.2d at 782.

[24] *Id.*

[25] *Id.*

[26] *Id.*

[27] *Id.*

information was readily available, why did the appellants pay $800 for a stolen list?"[28]

Those same considerations are not present here. Critically, unlike the facts in *Home Pride Foods*, the identities and contact information for the customers were publicly available. Moreover, once the customer changed agencies (which required minimal information), all of the customer's prior insurance information became available via the insurance carrier's Web site. Furthermore, unlike in *Home Pride Foods*, the information on the list did not provide a competitive advantage to Arlene. The record shows that the federal government sets the prices on crop insurance and that she already knew (or could find out) the farmers who purchased crop insurance. And while the appellants in *Home Pride Foods* had no explanation for why they had paid for a stolen list (if the information on it were actually ascertainable through proper means), here Arlene explained she took the list to track her commissions. A witness for First Express testified to having used such lists in the past for the same reason. Because the information on the customer list was ascertainable through proper means, we conclude that, as a matter of law, it was not a trade secret. We reverse the jury's finding against Arlene on the misappropriation of trade secrets claim.

### (c) Unjust Enrichment

Arlene argues that the court erred in denying her motions for summary judgment, directed verdict, judgment notwithstanding the verdict, and new trial regarding First Express' unjust enrichment claim. Arlene argues that "Nebraska law does not allow a party to seek unjustment [sic] enrichment damages at the same time it seeks actual damages for breach of an express contract."[29] First Express argues that it was simply maintaining alternate theories of recovery, which is acceptable under Nebraska law.

---

[28] *Id.*

[29] Brief for appellant Arlene at 33.

[8,9] Regardless whether the court properly allowed both claims to go to the jury, Arlene cannot be liable for both breach of contract and unjust enrichment for the same conduct.[30] Counsel for First Express conceded this at oral argument. Furthermore, there is no question regarding the priority of a claim for breach of contract and a claim for unjust enrichment flowing from the same conduct; liability under a contract displaces liability under an unjust enrichment theory.[31] Considering that the jury found her liable for breach of contract, it is as if the unjust enrichment verdict did not exist. That being the case, we need not address this assigned error because it is not necessary to the disposition of this appeal.[32]

Similarly, we need not address Arlene's argument that the court erred in instructing the jury regarding damages for the misappropriation of trade secrets claim and the unjust enrichment claim. Arlene cannot be liable for misappropriation of a trade secret (the customer list was not a trade secret) or unjust enrichment (she is already liable for breach of contract).

### (d) Summation

We affirm the jury's finding against Arlene on the breach of contract claim. Arlene failed to preserve for review her arguments challenging the enforceability of the underlying contract. We reverse the jury's finding against her on the misappropriation of trade secrets claim. The customer list was not a trade secret under § 87-502(4). And because the jury found against Arlene on the breach of contract claim, and because liability under a contract displaces liability under an unjust enrichment theory, Arlene is not liable for unjust enrichment.

### 2. MARK'S APPEAL

Mark takes issue with the jury's verdicts against him for misappropriation of trade secrets and unjust enrichment. As discussed earlier, the customer list was not a trade secret,

---

[30] See *Washa v. Miller*, 249 Neb. 941, 546 N.W.2d 813 (1996).

[31] See *City of Scottsbluff v. Waste Connections of Neb.*, 282 Neb. 848, 809 N.W.2d 725 (2011).

[32] See, e.g., *Conley v. Brazer*, 278 Neb. 508, 772 N.W.2d 545 (2009).

so we reverse the jury's verdict against Mark on the misappropriation of trade secrets claim. Regarding the jury's verdict against Mark for unjust enrichment, Mark makes several arguments as to why we must also reverse that verdict. These include, restated, that the record failed to show that he engaged in wrongful or unjust conduct, that his conduct proximately caused damage to First Express, or that piercing the corporate veil was appropriate. Alternatively, Mark also argues that the court should have granted a new trial for several of the same reasons and, in addition, because of alleged errors in the jury instructions.

We address only Mark's corporate veil argument because it is dispositive. Mark argues that the only benefit he received from the alleged use of the customer list "was from his ownership share of [the agency], a corporation."[33] And Mark argues that as an owner of the corporation, his corporate profits cannot be the subject of a lawsuit without piercing the corporate veil. First Express disagrees and argues that, regardless, Mark personally benefited because "he personally gained additional ownership in the company and in accomplishing a payoff to" another shareholder.[34]

Mark cites to cases in other jurisdictions for the proposition that "[u]njust enrichment cannot be used to recover benefits obtained as an owner of a corporation unless the pleadings and evidence warrant piercing the corporate veil."[35] Our research reveals other cases which support that position.[36]

---

[33] Brief for appellant Mark at 33.

[34] Brief for appellee First Express in response to brief of appellant Mark at 19.

[35] Brief for appellant Mark at 33 (citing *U.S. ex rel. Purcell v. MWI Corp.*, 520 F. Supp. 2d 158 (D.D.C. 2007); *Howard v. Turnbull*, 316 S.W.3d 431 (Mo. App. 2010); and *Levin v. Kitsis*, 82 A.D.3d 1051, 920 N.Y.S.2d 131 (2011)).

[36] See, *Bigio v. Coca-Cola Co.*, 675 F.3d 163 (2d Cir. 2012), *cert. denied* ___ U.S. ___, 133 S. Ct. 952, 184 L. Ed. 2d 752 (2013); *United States v. Dean Van Lines, Inc.*, 531 F.2d 289 (5th Cir. 1976); *Usov v. Lazar*, No. 13 Civ. 818 (RWS), 2013 U.S. Dist. LEXIS 89257 (S.D.N.Y. June 25, 2013); *Metalmeccanica Del Tiberina v. Kelleher*, No. 04-2467, 2005 U.S. App. LEXIS 23946 (4th Cir. Nov. 4, 2005) (unpublished opinion).

First Express has not provided us with any cases to the contrary, and we have not found any. Instead, courts seem to allow unjust enrichment claims against a shareholder for benefits obtained from the corporation only where piercing the corporate veil is appropriate.[37] Neither First Express' pleadings nor the evidence in this case support piercing the corporate veil.[38]

First Express argues, however, that Mark obtained a personal benefit (outside of his corporate profits) because he gained additional ownership interest in the company due to the use of the customer list. A jury verdict will not be set aside unless clearly wrong, and it is sufficient if any competent evidence is presented to the jury upon which it could find for the successful party.[39] But even viewed through this highly deferential lens, the record does not support First Express' assertion. Mark testified that he previously had an agreement to purchase up to a 20-percent ownership of the business. He specifically noted that the agreement required him to make set payments which could not be accelerated based on increased profits. He further testified that he "capped out" his ownership interest, in that he obtained the maximum 20-percent ownership, in late December 2009 or early 2010.

The record fails to show that Mark made any gains in his personal capacity or that he was unjustly enriched in his personal capacity. Any unjust benefit went to the corporation, not to Mark individually. The fact that Mark personally earned more money if his business earned more money is not sufficient to impose personal liability on Mark for unjust enrichment.[40]

So First Express' claim of unjust enrichment against Mark fails as a matter of law; he did not receive a personal benefit,

---

[37] See, e.g., *Sea-Land Services, Inc. v. Pepper Source*, 993 F.2d 1309 (7th Cir. 1993).

[38] See *Wolf v. Walt*, 247 Neb. 858, 530 N.W.2d 890 (1995).

[39] *Wulf, supra* note 2; *Orduna v. Total Constr. Servs.*, 271 Neb. 557, 713 N.W.2d 471 (2006).

[40] See cases cited *supra* notes 35-36.

in that he acted in his corporate capacity and received benefits only because of his status as a shareholder. And because there is no allegation or apparent reason to pierce the corporate veil, he is protected. No claim for unjust enrichment will lie against Mark. Thus, there is no need to address Mark's other assigned errors regarding the unjust enrichment claim. From the above analysis, we reverse both verdicts against Mark.

### 3. Modifying and Reversing Judgments

Recall that the jury found for First Express on the breach of contract claim against Arlene and awarded $506,035. It found for First Express on the trade secrets claim and awarded $280,320 against Arlene, $84,093 against Mark, and $56,061 against Mark's agency. And it also found for First Express on the unjust enrichment claim and awarded $280,320 against Arlene, $84,093 against Mark, and $56,061 against Mark's agency. The court entered judgment against Arlene for $506,035, against Mark for $84,093, and against Mark's agency for $56,061. But the court specifically noted that Arlene was individually liable for $365,881 and jointly and severally liable with Mark for $84,093 and with Mark's agency for $56,061. The court later reduced the judgment against Arlene to $500,275.72 based on a setoff agreed to by the parties.

By setting Arlene's individual liability at $365,881 and joint and several liability at $140,154, the court essentially apportioned Arlene's liability between the various claims—$365,881 for breach of contract and the remaining $140,154 for misappropriation of trade secrets and unjust enrichment. This is because neither Mark nor Mark's agency had a contract with First Express, so joint and several liability could only have been based on the claims of misappropriation of trade secrets and unjust enrichment. Because we conclude that Arlene is not liable for either misappropriation of trade secrets or unjust enrichment, we vacate the latter portion of the judgment ($140,154). We therefore modify the judgment against Arlene so that she is liable for $360,121.72 (after applying the setoff of $5,759.28). And, as stated earlier, we reverse the judgment against Mark in total.

## VI. CONCLUSION

We conclude that Arlene is liable for breach of contract but not for misappropriation of trade secrets or unjust enrichment. We modify the judgment against Arlene accordingly. We also conclude that Mark is not liable for misappropriation of trade secrets or unjust enrichment. We reverse the judgment against Mark.

Affirmed in part as modified,
and in part reversed.

Stephan, Miller-Lerman, and Cassel, JJ., not participating.

――――――――――――

State of Nebraska, appellee, v.
Antwan L. Jones, appellant.

___ N.W.2d ___

Filed November 22, 2013.    No. S-12-1208.

1. **Identification Procedures: Due Process: Appeal and Error.** A trial court's conclusion whether an identification is consistent with due process is reviewed de novo, but the court's findings of historical fact are reviewed for clear error.

2. **Motions to Suppress: Trial: Pretrial Procedure: Appeal and Error.** When a motion to suppress is denied pretrial and again during trial on renewed objection, an appellate court considers all the evidence, both from trial and from the hearings on the motion to suppress.

3. **Motions to Suppress: Courts: Records.** District courts shall articulate in writing or from the bench their general findings when denying or granting a motion to suppress. The degree of specificity required will vary from case to case.

4. **Constitutional Law: Identification Procedures: Due Process.** An identification procedure is constitutionally invalid only when it is so unnecessarily suggestive and conducive to an irreparably mistaken identification that a defendant is denied due process of law.

5. **Trial: Identification Procedures: Police Officers and Sheriffs: Evidence.** In determining the admissibility of an out-of-court identification, the trial court must first decide whether the police used an unnecessarily suggestive identification procedure. If they did, the court must next consider whether that procedure so tainted the resulting identification as to render it unreliable and thus inadmissible.

6. **Criminal Law: Identification Procedures: Witnesses: Words and Phrases.** A showup is usually defined as a one-on-one confrontation where the witness views only the suspect, and it is commonly conducted at the scene of the crime, shortly after the arrest or detention of a suspect and while the incident is still fresh in the witness' mind.